ATLANTIC RICHFIELD
COMPANY, Petitioner,

v.

DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS,
Respondent,

and

Elisa S. Janetis, Intervenor.

No. 84–1350.

District of Columbia Court of Appeals.

Argued Aug. 7, 1985.
Decided Sept. 26, 1986.

David A. Copus, Washington, D.C., with whom Lloyd C. Loomis and Randall B. Hamud were on briefs, for petitioner.

William J. Earl, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for respondent.

John M. Joyce, Washington, D.C., for intervenor.

Before NEWMAN and TERRY, Associate Judges, and REILLY, Senior Judge.

NEWMAN, Associate Judge:

Atlantic Richfield (ARCO) petitions for review of the District of Columbia Commission on Human Rights' (Commission) decision that ARCO discriminated against Elisa S. Janetis, a former employee, on the basis of her personal appearance in violation of the D.C. Human Rights Act. D.C.Code § 1–2501 *et seq.* (1981). The Commission also found that ARCO constructively discharged Janetis and awarded her $22,200 for backpay, compensatory damages and costs. ARCO argues that: (1) the amendment of Janetis' complaint to include constructive discharge was untimely; (2) the Commission's decision was not supported by substantial evidence; (3) the Commission misapplied the disparate treatment and constructive discharge doctrines; and (4) Janetis was not entitled to backpay or compensatory damages. We affirm.

I

Viewing the evidence in the light most favorable to Janetis, as we must, the record shows that during June of 1979, the Ingrid Sanders Employment Agency sent Elisa Janetis to the District of Columbia office of Atlantic Richfield. The office was a base for ARCO executives and lobbyists dealing with federal agencies and Congress. Janetis was interviewed by Rachel Morgret, the supervisor of Office Administration. Morgret hired Janetis on June 24, 1979 at a salary of $12,000 per year with benefits.

After Janetis' second or third week on the job, Morgret began to make comments to Janetis about the way she wore her clothes and their fit. Morgret criticized Janetis for her blouses being too tight, causing buttons to pop open and show cleavage. Morgret made many comments about Janetis' breasts. Morgret also criticized the cost of Janetis' clothes and questioned Janetis about her source of money to purchase them.

In addition to her comments about Janetis' appearance, Morgret criticized different aspects of her behavior. Janetis was reproved for sitting with her legs open, her enthusiastic friendliness towards office visitors, calling out to a secretary to cover her phones and mentioning ARCO's name during an alleged scene at a local restaurant. Morgret frequently questioned Janetis about her after-work activities and asked her if she got phone numbers from men visiting the office. Janetis believed that Morgret regarded her friendliness as a form of sexual solicitation.

During Janetis' three-month evaluation, Morgret praised her phone skills and treatment of visitors. But Morgret criticized Janetis for her low cut and tight blouses, disheveled hair, rudeness to coworkers and the messenger service, boisterous behavior and the unfavorable impression she created. When Janetis asked what Morgret meant by an unfavorable impression, Morgret told her that an ARCO official, Mr. MacKethan, stated that Janetis' behavior at a recent party resembled that of a prostitute.

The next day Janetis filed a complaint with the District of Columbia Office of Human Rights (OHR) claiming that she was constantly harrassed by Morgret because of her personal appearance, sex and race. Thereafter, Janetis met with Edgar H. Twine, the head of ARCO's D.C. office and the Manager of Federal Government Relations. Twine told Janetis that she would never find work in Washington again if she pressed her discrimination complaint. At a later meeting with Janetis' attorney, Gary E. Klein, Twine again threatened Janetis and added that it would be a good idea for Janetis to resign. On October 3, 1979, Janetis did resign and sent a letter to Morgret that said:

It is necessary that I take this action because of the physical and emotional stress precipitated by your allegations

about my personal appearance and conduct.

Janetis did not alter the allegations in her complaint after her resignation, but she informed OHR of her resignation during its investigation of her complaint.

After her resignation, Janetis looked for office work through newspaper advertisements and the Ingrid Sanders Employment Agency. The agency did not produce any placements for her from October 1979 to January 1981. When Janetis asked why, Linda Horst, an employment counselor, told her that it was probably because of her experience at ARCO, one of the agency's largest accounts. Janetis did not work in 1980. Finally, in January 1981, Janetis was hired by a law firm after the employment agency referred her to them. The law firm lobbied on Capitol Hill, and Janetis was afraid that the firm's lawyer would meet with ARCO lobbyists and learn about her experience at ARCO. Her anxiety increased when Janetis found out that her supervisor was a friend of an Ingrid Sanders employee who could have known about her problem at ARCO. Janetis resigned from her job in early July of 1981. Janetis believed that her supervisor was dissatisfied with her job performance as a result of knowing about her problems with ARCO. Janetis did not look for other office jobs because of her anxiety about Twine's threat and her belief that the threat was realized at the law firm. At the time of the hearing, Janetis was working as a salesperson at Nieman-Marcus earning $4.00 per hour without benefits except two weeks of vacation after one year. Her biweekly take-home pay was $231.86.

Meanwhile, OHR investigated Janetis' complaint. On August 8, 1980, OHR certified Janetis' complaint for public hearing, having found probable cause to believe that Janetis was discriminated against on the basis of her personal appearance. In a prehearing conference on October 28, 1981, OHR asked that the hearing also address a claim of constructive discharge against ARCO. After considering ARCO's and OHR's written arguments on this issue, the Commission ordered OHR to amend the complaint. The order explained that "[t]o charge the complainant, a lay person, with the technical understanding of constructive termination and other possible ramifications of her resignation would be unduly onerous." After a delay, OHR amended the complaint to include the constructive discharge claim on July 20, 1982.

The public hearing on Janetis' claims was held on August 3, 4 and 26, 1982. On August 3, 1982, OHR issued a probable cause determination on the constructive discharge claim and evidence on this issue was heard on the 26th. On September 14, 1984, the Commission issued its Final Decision and Order. This appeal by ARCO followed.

## II

This court must accept the decision of the Commission if it is supported by substantial evidence and is in accordance with relevant law. D.C.Code § 1–1510(a)(3)(E); *First Baptist Church v. District of Columbia Board of Zoning Adjustment*, 432 A.2d 695, 698 (D.C.1981). "Substantial evidence is 'more than a mere scintilla.' It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (citations omitted). If the Commission's decision is supported by substantial evidence and is in accordance with applicable law, the decision must be affirmed, even if this court would have reached a different decision on the same record. *Stewart v. District of Columbia Board of Zoning Adjustment*, 305 A.2d 516, 518 (D.C.1973) (citations omitted).

Although ARCO raises a number of challenges to the Commission's decision, only a few merit full discussion.[1]

---

1. ARCO's claim that the Commission had to specifically address each of ARCO's numerous

exceptions to the proposed decision is without merit. The D.C. Administrative Procedure Act

## 1. *Personal Appearance Discrimination*

The D.C. Human Rights Act prohibits discrimination on the basis of personal appearance. D.C.Code §§ 1–2501 *et seq.* (1981). Personal appearance is defined as:

the outward appearance of any person, irrespective of sex, with regard to bodily condition or characteristics, *manner of style of dress*, and manner or style of personal grooming, including, but not limited to, hair style and beards. *It shall not relate*, however, to the requirement of ... *prescribed standards* ... *when uniformly applied to a class of employees for a reasonable business purpose....* (Emphasis added.)

D.C.Code § 1–2502(22). In the present case, Janetis claims that she was treated differently than other employees because of her personal appearance.

■ In an employment discrimination case where disparate treatment is alleged, this court has adopted the Supreme Court's approach with respect to the allocation of the burdens of proof under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1982). *Miller v. American Coalition of Citizens with Disabilities,* 485 A.2d 186, 189 (D.C.1984); *RAP, Inc. v. District of Columbia Commission on Human Rights,* 485 A.2d 173, 176 (D.C.1984). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (citations omitted). The proof proceeds by alternate shiftings of intermediate evidentiary burdens.[2]

■ The employee bears the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. *Burdine, supra,* 450 U.S. at 252–53, 101 S.Ct. at 1093. *Furnco, supra* note 2, 438 U.S. at 576, 98 S.Ct. at 2949; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). This burden is not onerous. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. Establishment of the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983); *Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094; *see Furnco, supra,* 438 U.S. at 576, 577, 579–80, 98 S.Ct. at 2950–51.

The burden of production then shifts to the employer to rebut the presumption of discrimination by articulating some legitimate, nondiscriminatory reason for the employment action at issue. *Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978) (per curiam); *Furnco, supra,* 438 U.S. at 577–78, 98 S.Ct. at 2949–50. *McDonnell, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. The employer need not prove by a preponderance of the evidence that it was actually motivated by the proffered justification. *Burdine, supra,* 450 U.S. at 254, 259–60, 101 S.Ct. at 1094, 1096–97. *Sweeney, supra,* 439 U.S. at 25, 99 S.Ct. at 295. Rather, it may satisfy its

---

has no such requirement, D.C.Code § 1–1509(d) (1981), and ARCO failed to cite any District of Columbia cases in support of this point.

ARCO's argument that the Commission arbitrarily and categorically rejected the testimony of all ARCO's witnesses in violation of its due process rights is unsupported by the record. Further, the Commission is entitled to disbelieve the testimony of witnesses, particularly when it contradicts other evidence. *Arthur v. District of Columbia Nurses' Examining Board,* 459 A.2d 141, 146–47 (D.C.1983).

Finally, we find no merit to ARCO's contentions concerning damages.

**2.** The Supreme Court has cautioned that this method "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

burden by producing admissible evidence from which the trier of fact could rationally conclude that the employment action had not been motivated by discriminatory animus. *Burdine, supra,* 450 U.S. at 254–55, 257, 101 S.Ct. at 1094.

■ Finally, the employee must be afforded a fair opportunity to prove by a preponderance of the evidence that the employer's stated reason for its action was not its true reason but was in fact merely a pretext for discrimination. *Burdine, supra,* 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095; *Furnco, supra,* 438 U.S. at 578, 98 S.Ct. at 2950. *McDonnell, supra,* 411 U.S. at 804, 807, 93 S.Ct. at 1825, 1826. This burden merges with the ultimate burden of persuasion on the question of intentional discrimination. *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095. The employee may meet this burden "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. (*quoted in Aikens, supra,* 103 S.Ct. at 1482).

Within this framework, the Commission conducted its analysis of Janetis' claim. The Commission found that Janetis established a prima facie case of discrimination. Her evidence showed that her clothes were similar to other employees in comparable positions, but she was frequently subject to derogatory comments about her appearance and behavior.[3] Janetis' moral character was also called into question on account of her appearance (or Morgret's perception of it). ARCO's evidence also showed that Janetis was subject to criticism about her appearance and behavior.

The burden of proof then shifted to ARCO to articulate a legitimate, nondis-criminatory reason for its actions towards Janetis. ARCO justified its criticism of Janetis by claiming that she violated its standards for office dress and conduct. ARCO claimed (and the Commission recognized) that it expected its office to be quiet and dignified. The Commission found that this reason satisfied ARCO's burden of proof at this point in the proceeding.

The burden of proof then shifted to Janetis to show that ARCO's reason was actually a pretext for discrimination. Janetis met this burden by proving to the Commission that her appearance was similar to that of coworkers. Ultimately, the Commission did not believe ARCO's witnesses when they testified that Janetis was dressed provocatively and inappropriately. Instead, the Commission found that "[t]he nature of Morgret's criticism of the complainant's personal appearance manifests a preoccupation with the complainant's physique and the cost of her clothes." "[T]he character of the criticism progressed from comments about articles of attire to the comparison of her conduct with that of a prostitute." The Commission also noted that ARCO's claim that Janetis violated its standards for office attire lacked one of the prerequisites of a legitimate, nondiscriminatory reason for adverse treatment since ARCO did not have a uniformly prescribed standard of dress applied for reasonable business purpose.

■ We find that the Commission correctly applied the shifting burdens of proof. Further, the Commission's findings were based upon substantial evidence in the record. The testimony of Janetis and Ms. Aggrey supported the Commission's conclusion that her appearance was similar to other employees. The fact that ARCO's witnesses gave contrary testimony did not compel the Commission to reject the testimony of Janetis and the agency; the Com-

---

**3.** While criticism about behavior is not an element of personal appearance discrimination, we agree with the Commission's observation that this evidence was potentially relevant to Janetis' claim:

> The complaint must be afforded an opportunity to demonstrate that the non-appearance subjects of the respondent's criticism were merely pretexts for harassment that was motivated by disapproval of her personal appearance.

mission is entitled to evaluate credibility and to determine that question.[4]

### 2. Retaliation

Evidence in the record shows that ARCO violated D.C.Code § 1-2525 (1981), which provides:

> (a) It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed ... any right granted or protected under this chapter.

Janetis testified that Twine told her that she would never work in the District of Columbia again if she pressed her discrimination claim with the Office of Human Rights. Twine repeated this threat to Janetis' attorney, Klein. Twine also told Klein that he thought that Janetis should resign. The Commission believed Janetis' and Klein's testimony over that of Twine, who denied these statements.

■ It is a basic principle of administrative law that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). The final decision makes it clear that the Commission found that ARCO retaliated against Janetis, had factual support for this finding, and relied on it in its damages calculation against ARCO. In the Conclusions of Law section of its decision, the Commission found that Mr. Twine threatened to see that Janetis would have difficulty in obtaining employment if she persisted in her complaint. The Commission did not restate this finding in the section of its decision titled Final Order. The fact that the Commission made this omission does not prevent us from noting

that retaliation was one of the grounds on which it based its decision.

### 3. Constructive Discharge

■ A constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit. There is no requirement that the employer intend to force the employee to leave. *Clark v. Marsh,* 214 U.S.App.D.C. 350, 355, 665 F.2d 1168, 1173 (1981); *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61, 65 (5th Cir.1980) (rule requiring intent to force resignation is inconsistent "with the realities of modern employment"). Nor is there a requirement that the employee stay in an intolerable workplace for a particular period of time. *See Colely v. Consolidated Rail Corp.,* 561 F.Supp. 645, 651 (E.D. Mich.1982) (plaintiff who quit after four months of continuous sexually derogatory remarks was constructively discharged); *Clark v. Marsh, supra,* 214 U.S.App.D.C. at 356, 665 F.2d at 1174 (plaintiff who sought promotion for eleven years but was continually spurned was constructively discharged). Instead, courts have focused on the existence of aggravating conditions in the workplace which would lead a reasonable person to resign.

■ We find that the Commission had ample evidence to support its finding that Janetis was constructively discharged. The record shows that Janetis was subject to a continuous barrage of derogatory comments about her appearance, behavior, and morality to the point where her behavior was compared to that of a prostitute. Also, the evidence supports the finding that Twine suggested that Janetis resign. The Commission could properly conclude that these conditions were aggravating enough to force a reasonable person to resign.[5]

---

**4.** ARCO's witnesses criticized Janetis' clothing and appearance for different reasons. Three witnesses testified that the style and cut of Janetis' clothing was revealing, while Morgret denied that there was anything inappropriate about the style or length of Janetis' clothes.

Also, Morgret testified that Janetis had boasted about the cost of her clothes to Ms. Craig. However, Ms. Craig did not mention any boasting by Janetis.

**5.** ARCO claims that Janetis' failure to complain to ARCO officials about the harassment pre-

▪ Nonetheless, ARCO contends (and our dissenting Brother agrees) that the Commission was barred from ruling on the constructive discharge issue because of the provisions of D.C.Code § 1–2544 (1981) which require that complaints "shall be filed ... within one year of the occurrence of the unlawful discriminatory practice...." We disagree.

Janetis filed her original complaint with the Office of Human Rights in September 25, 1979; she "resigned" on October 3, 1979. Sometime prior to May 23, 1980, she informed OHR of the termination of her employment, for on that date, OHR issued a letter of determination finding that there was probable cause to believe that ARCO had discriminated against Janetis because of personal appearance; the determination letter specifically noted that Janetis "resigned" said position on October 3, 1979. On August 8, 1980, OHR certified the case for public hearing.

A pre-hearing conference was held on October 28, 1981. The report of that conference noted that OHR's brief on constructive discharge was due on a future date. This Commission, on December 24, 1981, directed OHR to formally amend its complaint to specifically allege constructive discharge.

ARCO and our dissenting colleague contend that our decision in *Davis v. Potomac Electric Power Co.*, 449 A.2d 278 (D.C. 1982), requires that we hold the constructive discharge claim time-barred by § 1–2544. The Commission contends, to the contrary, that the issue is controlled by our decision in such cases as *Stevens Chevrolet, Inc. v. District of Columbia Commission on Human Rights*, 498 A.2d 546 (D.C. 1985), and *JBG Properties, Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183 (D.C.1976). Specifically, the Commission contends that since Janetis' initial complaint was timely filed and she timely informed OHR of the termination of her employment, this was sufficient to place OHR, the office "responsible for developing all the facts ... during the course of the administrative investigation of that claim," on notice as to the issue of constructive discharge and place it properly before the Commission. The Commission cites to us federal cases construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, such as *Clark v. Marsh*, 281 U.S.App.D.C. 350, 354 n. 4, 665 F.2d 1168, 1172 n. 4 (D.C.Cir.1981); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970); *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir.1973), and *King v. Georgia Power Co.*, 295 F.Supp. 943, 947 (N.D.Ga. 1968).

We find ARCO's reliance on *Davis* to be misplaced. Rather, we agree with the Commission that our ruling here is governed by *Stevens Chevrolet* and *JBG Properties;* we find further support in cases construing Title VII of the U.S. Civil Rights Act of 1964.

In *Davis*, the complainant, without pursuing administrative remedies under the D.C. Human Rights Act, elected to proceed directly in the Superior Court, as he had a right to do. He filed his lawsuit on January 4, 1979, contending he was denied promotion on the basis of race. Shortly thereafter, Davis was fired by his employer. Some twenty months after his firing, Davis amended his original complaint to allege an additional claim of retaliatory discharge. The trial court held the additional claim time-barred. On appeal we affirmed. We

---

vents a finding of constructive discharge. We see no reason to require that an employee make repeated attempts to seek relief within the workplace before resigning. In *Clark v. Marsh, supra*, 214 U.S. App.D.C. at 355, 665 F.2d at 1174, the court simply considered the plaintiff's repeated attempts as a relevant factor in her constructive discharge claim. Further, ARCO admitted it had no formal complaint procedures or designated EEO officers. Any complaints to Ms. Morgret likely would have been futile, and during a meeting with Mr. Twine, Janetis was threatened with retaliation if she pursued her claim. In light of these factors, ARCO's argument seems a bit disingenuous.

held that the one year limitation period contained in the D.C. Human Rights Act applied to actions commenced by an employee in the Superior Court and that the subsequent amended complaint did not relate back to the filing of the original complaint pursuant to Super.Ct.Civ.R. 15(c). *Davis, supra,* 449 A.2d at 281–82.

*Stevens Chevrolet, Inc.* expands upon the rationale set forth in *Davis* and distinguished the *Davis* holding. In *Stevens,* we differentiated the case where an individual plaintiff in a civil action neglects to comply with procedural rules, and is thus held accountable for delay or inaction, from the case where an aggrieved party's interest is represented in a proceeding by an administrative agency (i.e. Office of Human Rights) which delays or otherwise neglects certain advocacy duties. The underlying facts of *Stevens Chevrolet, Inc.* involved an employer's third petition for review before this court of a reaffirmed order issued by the D.C. Commission of Human Rights where the employer was found to have unlawfully discriminated against an employee. We reversed and remanded the matter to the Commission having concluded that the agency's order had been issued without consideration of the hearing examiner's findings of fact. However, we expressly rejected Stevens Chevrolet's contention that the case should be dismissed because of the Commission's various delays and failure to comply with a prior remand order issued by this court some twenty months prior to its third petition for review. In so doing we noted that the rights of the aggrieved party whose interests are represented by the Commission will not be infringed by a dismissal of the case where such delays and malfeasance are the fault of the representative agency and not either individual party. *Stevens Chevrolet, Inc., supra,* 498 A.2d at 551 n. 7.

The rationale set forth in *Stevens Chevrolet, Inc.* is further bolstered by our holding in *JBG Properties, Inc. v. District of Columbia Office of Human Rights,* 364 A.2d 1183, 1185–86 (D.C.1976). In *JBG Properties* we held that the failure of the representative party (Office of Human Rights) to timely serve the defendant to a discrimination complaint would not require dismissal. We explained that the functioning of an agency representing the interests of an individual complainant should not jeopardize that aggrieved party's right to going forward with the claim, absent a showing of prejudice to the opposing party. Thus, in *JBG Properties* we again recognized a a difference between the case where an individual proceeds directly in Superior Court (i.e., *Davis* ) and that where one's legal interests have been entrusted to an administrative agency for litigation purposes.

In the present case, OHR, representing the legal interests of Ms. Janetis, failed to amend the complaint in a timely manner to include a constructive discharge claim, although OHR was on timely notice of the termination of employment. In light of *Stevens Chevrolet, Inc., supra,* and *JBG Properties, supra* (the delay having been caused by the administrative agency as opposed to Ms. Janetis), we hold the Commission did not err.[6]

*Affirmed.*

---

**6.** We note that cases construing Title VII of the U.S. Civil Rights Act of 1964 are in accord. *See, e.g., Sanchez, supra; Oubichon, supra; Clark v. Marsh, supra.* We have often looked to cases construing Title VII to aid us in construing the D.C. Human Rights Act. *See, e.g., Miller v. American Coalition of Citizens with Disabilities, supra; Newsweek Magazine v. District of Columbia Commission on Human Rights,* 376 A.2d 777 (D.C.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758 (1978). We further note

that in *Stevens Chevrolet, supra,* we relied on *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433–35, 102 S.Ct. 1148, 1156–57, 71 L.Ed.2d 265 (1982) (consideration of competing interests involved—i.e., private interest and length or finality of deprivation versus governmental error and magnitude of governmental interests—leads to conclusion that appellant has a due process entitlement to have the merits of his case considered). *Logan* appears to give our holding in *JBG Properties* constitutional underpinning.

REILLY, Senior Judge, dissenting:

With all deference to my colleagues, I am unable to concur in the affirmance of an agency order which seems to be not only unsupported by evidence on the merits of the case, but also issued in complete disregard of the statute of limitations. I am referring to that portion of the order which transforms a voluntary resignation on the part of the disgruntled employee, Elisa Janetis, into a constructive discharge and, on the basis of that erroneous finding, awards heavy damages for backpay and emotional distress.

### I

In my opinion, whatever financial loss complainant suffered was self-inflicted. Even accepting as true the complainant's own version of the admonitions of her supervisor, Rachel Morgret—the grounds of her original complaint of discrimination—it is apparent that such criticisms were intended to induce the complainant not to quit, but to improve her job performance by eliminating some causes for dissatisfaction with it. Had the supervisor some other purpose in mind, she would have had no occasion on the three month evaluation to have complimented complainant for her phone skills and treatment of visitors, while simultaneously pointing out some aspects of her behavior that this supervisor and other members of the staff found offensive. Only two of these, disheveled hair and overtight blouses, related to "personal appearance." [1] The other three—rudeness to coworkers and messengers, boisterous behavior, and creating an unfavorable impression—are not matters protected by the D.C. Human Rights Act. It was in response to complainant's own question, not anything Mrs. Morgret volunteered, that

complainant learned of a remark by a company official (McKeithen) that her conduct at an office party was such that *"if he had not known better,* he would have thought she was a prostitute." [2] Apparently, it was Morgret's summary of McKeithen's comment that led Janetis the next day to file a complaint with the Commission, for in defending the Commission's subsequent action, government counsel argued that this insulting characterization created "intolerable" working conditions which justified complainant in quitting her job. It should be noted, however, that insulting or otherwise, McKeithen's reaction was not based on complainant's "personal appearance," but upon her seemingly flirtatious conduct with one of the guests, a gentleman whose conversation with McKeithen she had interrupted.

Complainant in her testimony also dwells upon previous rebukes by Morgret because of unseemly posture, sleeping on an office sofa, and noisy conduct in a restaurant—all of which she resented. The Commission was at pains to review the conflicting testimony on these incidents—although quite irrelevant to the Human Rights Act—and make findings to the effect that most of these criticisms by Morgret were unjustified.

The majority opinion (note 3) concedes that criticism about behavior is not an element of personal appearance discrimination. Yet, it is clear that these criticisms were the gravamen of Janetis' complaint of discriminatory treatment. Why such criticisms should be viewed as having any relevance to conduct protected by the statute or treated as the Commission did as "merely pretexts of harassment ... motivated by

---

1. The D.C. Human Rights Act, D.C.Code § 1–2512 (1981), in addition to forbidding discrimination in employment on the basis of race or sex, also forbids discrimination against an employee on the ground of "personal appearance." The complainant in her testimony at the hearing admitted that she could have avoided criticism

of her apparel by the office supervisor had she worn clothing more "loose fitting."

2. Commission Final Decision and Order No. 9–P–643, p. 9. In view of this disclaimer, the statement in the majority opinion faulting the

disapproval of her personal appearance," is something of a mystery.[3]

## II

Wholly aside from these considerations, however, the majority's refusal to hold that the Commission was barred by the statute of limitations from entertaining the belated constructive discharge complaint, cannot be supported. Such refusal flies in the face of the wording of the statute, D.C.Code § 1–2544(a) (1981), and its authoritative construction in a controlling decision of this court.

This subsection of the code—one of the provisions of the District of Columbia Human Rights Act, *id.* §§ 1–2501, –2557, inclusive—requires that complaints "shall be filed ... within one year of the *occurrence* of the unlawful discriminatory practice...." Intervenor's original complaint was filed on September 26, 1979, while she was still employed by petitioner. The complaint charged her employer with discrimination by harassing her on the basis of personal appearance (manner of dress), sex (female), and race (white). About a week later (October 3, 1979), she submitted a letter of resignation and quit her employment the same day.

Obviously, the last two grounds asserted in the complaint were frivolous, and the Office of Human Rights (OHR) in investigating the charges, found probable cause only to credit the allegations based on personal appearance, but not on race or sex. The report of the investigation shows that OHR was informed that Janetis had resigned from her employment, but there is nothing in the document (referred to in the majority opinion as a "letter of determination" dated May 23, 1980) to indicate that she accused the company of forcing her to quit under circumstances tantamount to a constructive discharge.

It was not until more than two years later after leaving her job that she ever complained to the agency that she had been constructively discharged. According to the final decision of the Commission itself, the issue was raised by counsel for the complainant at a pre-hearing conference on October 28, 1981, conducted by a hearing examiner. The parties were then told to submit memoranda of law. After directing, several months later, that Janetis amend the complaint to include the allegation of constructive discharge, the Commission on the basis of evidence concerning events prior to, but also subsequent to the filing of the original complaint, sustained this allegation in a decision ordering backpay for a period of some 15 months.[4] Such action by the Commission was plainly in excess of its statutory authority. It flouted a decision of this court, *Davis v. Poto-*

company for comparing her behavior to that of a prostitute seems a bit exaggerated.

**3.** To sustain this finding as supported by "substantial evidence" disregards repeated holdings of the Supreme Court that "substantial evidence is more than a mere scintilla." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Moreover, if the Commission's conclusion that complainant's appearance was "similar to other employees" was justified—as the majority opinion holds—how could such appearance, if merely the product of Morgret's imagination, support Janetis' "claim that she was treated differently than other employees because of her personal appearance?"

**4.** The Commission attempted to justify this ruling by stating that "the complainant's failure to appreciate the necessity of amending her complaint within one year of her termination was not chargeable to her—a lay person." The term "lay person" implies that complainant lacked any professional legal advice at the time she voluntarily terminated her own employment. Even were there a clause in the Act authorizing agency waiver of the statute of limitations under such circumstances—which there is not— the findings of the Commission itself .disclose this was not the fact. According to these findings she did consult a lawyer after her conference with the office manager (Twine) and it was at her request that he presented her supposed grievance to Twine a day or two later. It may have been her lawyer's account of what happened at that interview which prompted her decision to quit her job, but it did not occur to either of them that the resignation was made under circumstances warranting a claim of discharge.

*mac Electric Power Co.*, 449 A.2d 278 (D.C.1982), where we held:

> The Act makes clear that the one year limitation period in which an aggrieved party may file a complaint applies to administrative proceedings before the Office of Human Rights (OHR), D.C. Code § 6–2284(a) (1973).[5]

*Id.* at 280.

Having reached this conclusion, we then were confronted with the question of whether this period of limitations should apply to plaintiffs in actions commenced in the Superior Court for redress of discrimination under the Human Rights Act, as well as to persons seeking remedial action by an agency. We decided that it did, and went on to hold that an employee who had begun a suit under the Human Rights Act alleging discrimination in promotion was not entitled to amend his complaint twenty months after his employment was terminated to allege a retaliatory discharge, despite (a) the general three-year statute governing actions at law, and (b) the liberal rules of the trial court, Super.Ct.Civ.R. 15 (c), on amendments to pleadings. As we pointed out:

> The fiction of "relation back" is of obvious importance to one seeking to avoid the bar interposed by the period of limitation. The rule is founded upon the premise that once litigation involving a particular core of fact has commenced, a defendant is not entitled to the protection afforded by a statute of limitations against the subsequent assertion of claims arising out of the events described in the original pleadings. 6 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, *Civil*, § 1496, at 482–83. However, a new cause of action may not be set forth in an amended complaint by setting up new matter or changed circumstances arising after the filing of the original complaint. Where the claimant attempts to allege an entirely different transaction by amendment, the new claim is subject

to the statute of limitations defense. *Id.* § 1497, at 489–90.

> In this instance, appellant was not discharged until approximately two weeks after the original complaint was filed. Rule 15(c) does not rescue allegations based upon events that had not yet occurred at the time the original complaint was filed.

*Davis, supra*, 449 A.2d at 281.

In disregard of this observation, the Commission's decision in justifying allowance of the amendment to the complaint on the ground that the employer was then given "sufficient time to prepare a defense," said: "No prejudice was seen to result to the respondent [*i.e.*, the employer] since the issue of constructive discharge depended upon the same evidence necessary to resolve the issues already before the Commission."

Again, the Commission misstated the facts, for its disposition of the discharged issue was bolstered by findings relating to events which had not occurred when the original complaint was filed, *viz.*, the threats of retaliation and the recommendation that complainant resign attributed to Twine in his subsequent interviews with complainant and her attorney.

My colleagues in their opinion also lean heavily upon these post-complaint events, pointing out that because the Commission accepted (despite Twine's denial) the account of these conversations given by Janetis and her lawyer, the employer had violated another subsection of the Human Rights Act which makes it unlawful to threaten or retaliate against employees exercising rights granted under the Act. D.C.Code § 1–2525 (1981). But even assuming that the amendment to the complaint (constructive discharge) encompassed Twine's threats of retaliation, this did not justify the agency in entertaining a charge filed a whole year after the statute of limitations had run. In *Davis, supra*, we held that a similar motion to amend (retaliatory discharge) was barred by the running of that

---

**5.** Now codified in the 1981 revision of the D.C. Code as § 1–2544(a), *supra.*

statute. As we pointed out in that opinion, plaintiff by "setting up new matter or changed circumstances arising after the filing of the original complaint, where the claimant attempts to allege an entirely different transaction by amendment, the new claim is subject to the statute of limitations defense." 449 A.2d at 281 (citations omitted).

Nor is it true that petitioner, ARCO, suffered no prejudice by the belated raising of the discharge issue. As petitioner points out, such delay deprived it of an opportunity to deal with this issue through conciliation. Even were lack of prejudice relevant in cases where the statute of limitations is pleaded as a defense, the belated filing of the complaint caused severe financial damage to petitioner. Had ARCO received timely notice of a discharge complaint, it could have tolled the running of backpay—quite irrespective of the merits— by offering reinstatement to the employee. But by the date this charge was added, it was impossible to take such a precautionary step as complainant was no longer unemployed.

In an attempt to avoid the dispositive impact of our *Davis* decision on this case, my colleagues find "ARCO's reliance on *Davis* to be misplaced." Instead, they rely upon two opinions of this court that neither dealt or even mentioned the applicable statute of limitations, § 1–2544 (a) *supra, viz., Stevens Chevrolet, Inc. v. District of Columbia Commission on Human Rights,* 498 A.2d 546 (D.C.1985), and *JBG Properties, Inc. v. District of Columbia Office of Human Rights,* 364 A.2d 1183 (D.C.1976). A fair reading of these opinions reveals that it is the majority reliance upon them that is misplaced rather than ARCO's reliance on *Davis.*

We are told that *Stevens Chevrolet* distinguished the *Davis* holding from cases in which the aggrieved party goes to court rather than to an administrative agency for relief. Such observation ignores the explicit premise of *Davis,* quoted *supra,* to the effect that the period of limitations in the Human Rights Act clearly applies to an administrative proceeding. Moreover, there is not a word in the *Stevens* opinion to show that the division which handed down that decision "distinguished the *Davis* holding." It would have had no occasion to do so, for the complaint in that case was timely filed—only two months after the complainant's discharge—thus, foreclosing any of the parties from invoking § 2544(a). What the petitioner in *Stevens* sought was to set aside an adverse order of the Commission on the ground that the hearing examiner, who had heard the testimony upon which the agency made its ultimate findings, had never filed a report stating his own findings of fact and therefore the final Commission order violated the Administrative Procedure Act. We agreed with this contention, vacated the order, and remanded the case for a new hearing.

What the majority opinion in this case refers to as the rule that should govern here, was our disposition of Steven's request for additional relief, *viz.,* dismissal because of administrative delay. This was only a minor aspect of the Stevens opinion. In a footnote,[6] we denied this request saying that the complainant, as well as the employer, had a right to a proper hearing when the delay was not the fault of either party. Such ruling of course is not peculiar to review of administrative agency orders, but is also applicable to appeals in damage actions, where an appellant who successfully argues that a judgment should not be permitted to stand after an erroneous trial ruling precluded a relevant defense, is held entitled to a new trial, but not dismissal.

The notion that OHR in the instant case was some how derelict in its duty by not

6. *Stevens Chevrolet, supra,* 498 A.2d at 551 n. 7.

adding a constructive discharge allegation to the complaint after having learned within the one year period of complainant's letter of resignation, is something made out of whole cloth by the Corporation Counsel's office when called upon to defend the challenged order of the Commission. A voluntary resignation, no matter how petulantly worded, does not imply—let alone prove—a constructive discharge. Obviously OHR had no reason to advise complainant that she should amend her complaint when it never occurred to her that her resignation was not purely voluntary. The Commission itself, as I have noted, found that this issue was not raised by complainant until two years after she had resigned. I find it strange that the majority opinion should adopt a theory which the Commission's own findings—as distinguished from the brief of its defenders—clearly negate.

Reliance on *JBG Properties* is equally wide of the mark. That case preceded the *Davis* opinion by several years, but was cited with approval in one of the footnotes to the latter. There we decided that a slightly belated service of process—a breach of the agency rules of practice, not the statute of limitations—was not so prejudicial that the complaint should be dismissed. Such holding was entirely consistent with decisions of this court disapproving of the severe sanction of dismissal in cases where counsel fail to meet deadlines set by Superior Court rules in filing memoranda or other pleadings, *e.g., National Voter Contact, Inc. v. Versace,* 511 A.2d 393 (D.C.1986).

Thus, in my view, it is impossible to distinguish this case from *Davis.* The federal cases cited by the majority did not construe the local statute and have no bearing here. Accordingly, under our own rules of decision, the Commission's finding of constructive discharge and the back pay award should be vacated. *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).