Marnie RUSS, Plaintiff,

v.

**VAN SCOYOC ASSOCIATES, INC., et. al., Defendants.**

**No. 98–03151–RCL.**

United States District Court, District of Columbia.

June 30, 1999.

Diane J. Veilleux, Shaw, Bransford, Veilleux & Roth, Washington, DC, for plaintiff.

Allen S. Rugg, Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on individual defendant Stuart Van Scoyoc's motion to dismiss the employment discrimination and constructive discharge claims brought against him by plaintiff Marnie Russ, and a separate motion filed by the corporate defendant, Van Scoyoc Associates, Inc. ("VSA"), to dismiss the constructive discharge claim.

Plaintiff concedes the dismissal of the Title VII and constructive discharge claims against the individual defendant, but asserts a right to sustain the claim against Mr. Van Scoyoc based on the District of Columbia Human Rights Ac. ("DCHRA"). Upon consideration of the written submissions of the parties, and the relevant law, defendant Mr. Van Scoyoc's motion to dismiss the claim under the DCHRA is denied. Further, defendant VSA's motion to dismiss the claim of constructive discharge is also denied.

### I. Background

This is an action for injunctive relief and for compensatory and punitive damages caused by defendant's actions against Ms. Marnie Russ on the basis of sex discrimination (female), sexual harassment, reprisal for prior EEO-activity, and constructive discharge. The two named defendants in this action are VSA, and Mr. Van Scoyoc himself. The complaint was segmented into five counts, three involving discrimination based on Title VII theories, one based on violation of the District of Columbia Human Rights Act, and one based on constructive discharge.

In the motion to dismiss, defendant Mr. Van Scoyoc asserts that all plaintiff's theories of liability are meritless because defendant is not a proper party to these claims. In her opposition, plaintiff does not oppose the dismissal of defendant Mr. Van Scoyoc with regard to the Title VII and constructive discharge claims, but opposes the dismissal with regard to the

District of Columbia Human Rights Act ("DCHRA") claim. Further, plaintiff also opposes defendant Van Scoyoc Associates' motion to dismiss the constructive discharge claim.

In October 1996, Marnie Russ was hired by VSA as a receptionist. In March 1997, plaintiff was promoted to the position of Administrative Assistant with legislative responsibilities. Her salary was $30,000 per year. In October 1997, plaintiff alleges that she was approached by another firm for employment at a higher salary. At this time, plaintiff discussed the salary issue with Janet Buckley, Office Manager. Plaintiff alleges that she told Ms. Buckley that the other firm was offering her $35,000 per year. Plaintiff contends that Ms. Buckley assured her that as soon as Ms. Russ had her annual review, that she "would be where she wanted to be." *See* Pl.Comp. at 4. Furthermore, plaintiff contends that Ms. Buckley stated that Ms. Russ would receive a 10% bonus at the end of the year. Also, plaintiff asserts that Ms. Buckley stated that it was both her and Mr. Van Scoyoc's intention to promote plaintiff to Legislative Assistant. That position carried a $35,000 salary per year. Plaintiff's review was due in November 1997. However, in November 1997, Ms. Buckley told plaintiff that the annual review period had been changed to December 1997.

On December 8, 1997, Mr. Jan Schoonmaker, Vice President, asked plaintiff to help him prepare for a meeting for which he was running late. Specifically, plaintiff states that she was asked to find a copy of slides for Mr. Schoonmaker. In reviewing the slides, plaintiff asserts that Mr. Schoonmaker shouted at her because some of the slides were missing. Further, Mr. Schoonmaker allegedly lunged towards Ms. Russ with a two-inch stack of papers and shouted that he should have never trusted her with this. Subsequently, plaintiff began crying and left the room. Plaintiff returned to her office once Mr. Schoonmaker had left for the meeting.

Later that day, plaintiff sent an e-mail to Mr. Schoonmaker, demanding an apology for his actions. Mr. Schoonmaker apologized to plaintiff the next day.

Plaintiff contends that Mr. Schoonmaker is known in the office for his violent temper. Specifically, she contends that both Ms. Buckley and Mr. Van Scoyoc told her that Mr. Schoonmaker has a bad temper and a reputation for mistreating female employees, but that the firm tolerates it because "he has no family or friends; work is all he has." *See* Pl.Comp. at 6. In fact, in 1996, plaintiff contends that Mr. Schoonmaker physically assaulted another subordinate, Ms. Roseanna Haley. Further, plaintiff asserts that a confidential agreement was reached between Ms. Haley and Van Scoyoc, where Mr. Schoonmaker would be forced to attend counseling. However, plaintiff believes that Mr. Schoonmaker never attended counseling.

Plaintiff alleges other incidents involving Mr. Schoonmaker. Specifically, that he broke the photocopy machine in plaintiff's presence several times, by pounding on it in anger and frustration. Further, plaintiff alleges that there were several occasions when she was reduced to tears in front of co-workers because of Mr. Schoonmaker's behavior. Plaintiff asserts that she complained repeatedly to Ms. Haley and Ms. Buckley about Mr. Schoonmaker's treatment of her, but no action was taken to reassign her from Mr. Schoonmaker's supervisory control.

On December 9, 1997, the office held its annual Christmas party at the Old Ebbitt Grill. During this party, several people were intoxicated, including Mr. Paul Grimm, Vice President. At 3:00 p.m., plaintiff alleges that Mr. Grimm wanted to move the party to the Bottom Line, a nearby bar. Several people demonstrated an interest in joining Mr. Grimm. Specifically, Ms. Delgado. Executive Assistant to Mr. Van Scoyoc, was considering joining the group, when Mr. Van Scoyoc advised her not to go because Mr. Grimm had been drinking.

At 3 p.m., plaintiff and a few of her colleagues joined the group at the Bottom Line bar. Plaintiff states that she only joined the group because her roommate, Ms. McVey, was visibly intoxicated. Plaintiff alleges that Mr. Grimm sexually harassed her at the bar. Specifically, plaintiff asserts that Mr. Grimm made loud comments of a sexual nature to her in front of other co-workers. According to plaintiff, Mr. Grimm made comments about the size of plaintiff's breasts, and called the bartender over to observe their size. Plaintiff asserts that she asked Mr. Grimm to stop, but he refused. Further, plaintiff contends that Mr. Grimm continued to make suggestive remarks, such as, "Unbutton your shirt. Come on, let's do it." *See* Pl.Comp. at 9. Plaintiff further states that when Mr. Grimm reiterated his remarks about plaintiff's breasts, that one of plaintiff's colleagues told Mr. Grimm that he should stop making such remarks. At this point, plaintiff was so uncomfortable that she asked to call her boyfriend. Upon hearing this, Mr. Grimm allegedly continued with his suggestive remarks, stating that he wanted to have oral sex with plaintiff. Plaintiff left the table to make her phone call, and the bartender came over to escort Mr. Grimm from the premises.

Plaintiff returned to the office, and told both Ms. Haley and Ms. Quist about Mr. Grimm's behavior. Ms. Russ states that she told Ms. Haley not to say anything about the incident until she decided what to do. However, plaintiff asserts that Ms. Haley immediately reported the incident to Ms. Buckley, who then reported to Mr. Van Scoyoc. The next day, Mr. Grimm left a voice mail for plaintiff, apologizing for the incident. However, plaintiff contends that Mr. Grimm was laughing during the voice mail, and stated that plaintiff could come down to his office and "kick his butt." *See* Pl.Comp. at 11. Plaintiff states that she felt uneasy about the whole situation, and left work early that day.

Later that evening, Mr. Grimm called plaintiff at home to apologize. Plaintiff accepted his apology, and stated that she wanted to move on. On December 11, 1997, Mr. Van Scoyoc contacted plaintiff, and wished to discuss the incidents with Mr. Schoonmaker and Mr. Grimm. At the meeting, plaintiff asserts that Mr. Van Scoyoc told her that she would no longer have to work with Mr. Schoonmaker. However, plaintiff states that these promises had been given before, and were not followed. Regarding Mr. Grimm, Mr. Van Scoyoc told plaintiff that Mr. Grimm and his wife were having martial problems, and that it would be a shame if his wife were to discover any of this. Mr. Van Scoyoc then told plaintiff that he would take the weekend to think the situation over, and set up another meeting for Monday.

Later that same day, plaintiff met with Ms. Buckley about her annual review. Ms. Buckley presented Ms. Russ with a salary raise to $32,000, and a 6% bonus. Plaintiff expressed her dismay, stating that Ms. Buckley had earlier promised her a salary of $35,000 and a 10% bonus. Ms. Buckley stated that plaintiff was getting these amounts because she had other recent pay increases. Plaintiff was upset with this final disappointment of the week, and left in tears.

After thinking the events over, plaintiff decided to leave the firm. On December 14, 1997, plaintiff returned to the office to clean out her desk. On December 15th, plaintiff told Mr. Van Scoyoc that she was not planning to return to work after Christmas. Mr. Van Scoyoc told her that he would not accept her resignation. Mr. Van Scoyoc reiterated Ms. Buckley's reason for not giving plaintiff the raise she desired. Plaintiff alleges that she countered that the raise was a moot point, and that she was leaving because she felt unsupported by management with regard to the incidents involving Mr. Schoonmaker and Mr. Grimm. Plaintiff contends that Mr. Van Scoyoc responded that "in this business these things are going to hap-

pen." *See* Pl.Comp. at 15. Further, plaintiff asserts that Mr. Van Scoyoc told her that she should learn to deal with these things.

Plaintiff left for Montana on December 15, 1997. While in Montana, plaintiff learned that Mr. Van Scoyoc held a meeting with support staff, and the staff advised that they wanted Mr. Schoonmaker fired because he was a repeat offender. Further, the staff recommended that Mr. Grimm be placed on probation for his actions. Also, the staff believed that both men should issue written apologies to plaintiff. Plaintiff contends that she learned that both men were going to be fined $10,000, placed on a two-week suspension from work, and assigned mandatory counseling.

While in Montana, plaintiff received a letter from Mr. Van Scoyoc, outlining the reasons for the denial of the higher pay increase. Nothing in the letter mentioned possible actions against Mr. Schoonmaker and Mr. Grimm. Plaintiff asserts that Ms. Quist, at Mr. Van Scoyoc's request, informed plaintiff of the actions planned against Mr. Schoonmaker and Mr. Grimm. Plaintiff then decided to stay with the firm and wrote a demand letter, which she planned to present to Mr. Van Scoyoc upon her return from Montana. Plaintiff set up a meeting with Mr. Van Scoyoc for January 5, 1998.

Plaintiff arrived at this meeting with an attorney. When Mr. Van Scoyoc saw that plaintiff had brought an attorney, he immediately asked plaintiff to surrender her keys and leave the building. Plaintiff further alleges that she learned that neither Mr. Schoonmaker nor Mr. Grimm were fined, suspended, or required to receive counseling, as she was told.

## II. Defendant Mr. Stuart Van Scoyoc's Motion To Dismiss DCHRA Claim

### A. Background

Plaintiff's sole cause of action against defendant Mr. Van Scoyoc is for discrimi-

nation based on retaliation, which is in direct violation of the DCHRA. Plaintiff alleges that as a result of advising Ms. Haley that she needed to think about what she wanted to do with respect to Mr. Grimm's actions on December 9, 1997, and bringing an attorney with her to her meeting with Mr. Van Scoyoc on January 5, 1998, Mr. Van Scoyoc perceived plaintiff to be threatening to file an EEO complaint. Consequently, in reprisal for engaging in protected EEO activity, plaintiff alleges that she was given a smaller raise and bonus, not promoted to the position of Legislative Assistant, and terminated during her January 5, 1998 meeting with Mr. Van Scoyoc. Defendant Van Scoyoc seeks to dismiss this cause of action, on the grounds that he is not a proper defendant under the DCHRA.

### B. Motion To Dismiss

Dismissal is appropriate "only if 'it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations.'" *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Martin v. Ezeagu,* 816 F.Supp. 20, 23 (D.D.C.1993). In evaluating a motion to dismiss, the court must construe the complaint in the light most favorable to plaintiff and give plaintiff "the benefit of all inferences that can be derived from the facts alleged." *See Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979).

### C. Defendant Is A Proper Party Under DCHRA

The issue before the court is whether individual supervisors can be personally liable for acts of discrimination taken during the course of his or her employment. Title VII specifically prohibits acts of discrimination by an "employer," and makes a clear distinction between "persons" and "employers." 42 U.S.C. § 2000e–2(a). Conversely, the DCHRA does not make such a distinction. D.C.Code 1–2501, *et seq.* Defendant as-

serts that the DCHRA should be interpreted in the same manner as Title VII, and its actions should be restricted to employers. However, defendant points out that one case in this court has held that individual supervisors can be held liable for their acts of discrimination. *See Martini v. Federal National Mortgage Ass'n*, 977 F.Supp. 464, 479 (1997), *rev'd* on other grounds, 178 F.3d 1336, 1999 WL 397423 (D.C.Cir.1999). Because of the strong factual similarities between these cases, the court adopts the line of reasoning used in *Martini*. Subsequently, defendant Mr. Van Scoyoc's motion to dismiss the DCHRA claim is denied.

In *Martini*, plaintiff worked for the Federal National Mortgage Association ("Fannie Mae") from July 1988 until March 1995. *Id.* at 464. Plaintiff alleged that defendant Kobayashi repeatedly harassed and demeaned her as a woman, in violation of Title VII and the DCHRA. Further, she alleged that defendant Knight, her supervisor, ignored plaintiff's complaints when told of defendant Kobayashi's behavior. *See id.* Finally, plaintiff alleged that defendants retaliated against her for complaining about defendant Kobayashi's behavior. *See id.*

Defendants brought a motion to dismiss with respect to defendants Knight and Kobayashi. *See id.* In fact, the Title VII claims against both parties were dismissed, because neither could be individually liable under Title VII. *See id.* However, the court came to a different conclusion on the claims under the DCHRA. *Id.* at 478. Specifically, the court stated that although District of Columbia courts look to Title VII in interpreting the provisions of the DCHRA, they have done so only where "appropriate." *See Arthur Young & Co. v. Sutherland*, 631 A.2d 354 (D.C. 1993); *Benefits Communication Corp. v. Klieforth*, 642 A.2d 1299 (D.C.1994). The court concluded that the language of the DCHRA relating to discrimination in employment compels the conclusion that Title VII is not an appropriate analog for determining the scope of individual supervisor liability under the DCHRA. *Martini*, 977 F.Supp. at 479. Consequently, the court concluded that individual supervisors can be held liable for their acts of discrimination. *See id.*

A similar finding occurs here. The two cases have extremely strong similarities. As in *Martini*, plaintiff here has asserted two claims, one under Title VII and one under the DCHRA. Both groups of defendants brought motions to dismiss, and the Title VII claims were dismissed in both instances. However, the treatment of the Title VII claims did not preclude the *Martini* court from treating the DCHRA claims differently. The *Martini* court was faced with the exact same scenario, and elected to place possible liability on individual supervisors under the DCHRA. This court finds no reason to pursue a different course than the one selected in *Martini*. For the foregoing reasons, the motion to dismiss on the ground that defendant Mr. Van Scoyoc is not a proper party is hereby DENIED as to the DCHRA claim. With respect to the Title VII and constructive discharge claims against Mr. Van Scoyoc, the motion to dismiss is GRANTED.

III. Defendant Van Scoyoc Associates' Motion To Dismiss Claim Of Constructive Discharge

A. Standards For Constructive Discharge

Constructive discharge occurs when an employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit. *See Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981); *Atlantic Richfield v. D.C. Commission on Human Rights*, 515 A.2d 1095, 1101 (D.C.1986). Intolerability is assessed by the objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign. *See Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 74 FEP Cases 391 (D.C.Cir.1997). Whether working condi-

tions are so intolerable that a reasonable person is forced to resign is a question for the trier of fact. *See Simpson v. Federal Mine Safety & Health Review Commission,* 842 F.2d 453, 463 (D.C.Cir.1988); *Arthur Young & Co.,* 631 A.2d at 362.

There is no requirement that the employer "intend" to force the employee to leave. *See Hopkins v. Price Waterhouse,* 825 F.2d 458, 472 (D.C.Cir.1987); *rev'd* in part on other grounds, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) It is not necessary to prove that the employer deliberately created such conditions with an intent to coerce the employee into resigning; it is sufficient if the employer simply tolerates discriminatory working conditions that would drive a reasonable person to resign. *Arthur Young & Co.,* 631 A.2d at 364 (*citing Hopkins v. Price Waterhouse,* 825 F.2d at 472). Instead, courts focus on the existence of aggravating factors in the workplace which would lead a reasonable person to resign, *Atlantic Richfield,* 515 A.2d at 1101; *see also Dashnaw v. Pena,* 12 F.3d 1112 (D.C.Cir.1994). The purpose of aggravating factors is so plaintiff cannot claim constructive discharge based solely on an act of discrimination. *Clark,* 665 F.2d at 1172. Plaintiff must show other evidence of objectionable working conditions. *See id.*

B. Analysis

Plaintiff has satisfied her burden of presenting a set of facts from which possible relief could be granted. First, plaintiff does not have to prove that VSA "intended" to force her resignation. Plaintiff must only prove that VSA tolerated discriminatory working conditions that would drive a reasonable person to resign. Plaintiff has met this burden. Specifically, with the incident involving Mr. Schoonmaker, plaintiff submitted evidence that Mr. Van Scoyoc's response was that the firm tolerates this behavior because "work is all he has." That evidence demonstrates VSA's toleration of Mr. Schoonmaker's behavior.

Second, plaintiff's evidence, if credited, may demonstrate "intolerable" working conditions. On December 8, 1997, Mr. Schoonmaker lunged at plaintiff with a two-inch stack of papers and shouted that he should have never trusted her with this. VSA was aware of this behavior, and plaintiff has presented evidence that VSA did nothing to remedy the situation. Also, plaintiff presented evidence that she was subjected to numerous, sexually degrading comments and gestures by Mr. Grimm in front of her colleagues at the Bottom Line Bar. Once again, plaintiff presented evidence that VSA did nothing to remedy the situation. In fact, plaintiff submits evidence that Mr. Van Scoyoc told her that "these things are going to happen."

From this evidence alone, a reasonable juror could find that a reasonable person would be forced to resign under these circumstances. Further, under *Simpson,* the question of whether a reasonable person would feel compelled to resign is one for the trier of fact, and need not be decided at this juncture.

Third, plaintiff has submitted sufficient evidence of "aggravating factors." Specifically, plaintiff submitted evidence of numerous incidents involving Mr. Schoonmaker before the December 8, 1997 incident. Plaintiff discusses several occasions where she was reduced to tears in front of co-workers because of poor treatment from Mr. Schoonmaker. Further, plaintiff also demonstrates evidence of her salary and bonus increases, which were less than what was promised by both Ms. Buckley and Mr. Van Scoyoc. From these incidents, plaintiff has demonstrated objectionable working conditions outside of the alleged acts of discrimination. For the foregoing reasons, defendant VSA's motion to dismiss the constructive discharge claim is DENIED.

IV. Conclusion

For these reasons, the court will deny defendant Mr. Van Scoyoc's motion to dis-

miss the DCHRA claim brought by Marnie B. Russ. With respect to the Title VII and constructive discharge claims against Mr. Van Scoyoc, the motion to dismiss will be granted. Finally, the court will deny defendant VSA's motion to dismiss the constructive discharge claim.