Elizabeth A. MARTINI, Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, et al., Defendants.

Civil Action No. 95–1341 (GK).

United States District Court, District of Columbia.

Sept. 10, 1997.

See also 1997 WL 581308.

David E. Schreiber, Larry S. Greenberg, Bethesda, MD, for Plaintiff.

Sharon A. Cummings, Eric S. Jackson, Robins, Kaplan, Miller & Ciresi, Washington, DC, for Defendants.

KESSLER, District Judge.

## MEMORANDUM OPINION

This matter is before the Court upon Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [# 113] and Defendants' Motion to Alter or Amend Judgment and Apply the Damages Cap Under Title VII of the Civil Rights Act [# 115]. Between November 18 and December 9, 1996, Plaintiff's gender-based discrimination and retaliation claims under Title VII of the Civil Rights Act, *as amended,* 42 U.S.C. § 2000e *et seq.,* and the District of Columbia Human Rights Act, D.C.Code § 1–2501 *et seq.,* were tried before a jury in this Court. On December 12, 1996, the jury rendered a verdict for Plaintiff on her claims. Defendants now raise several · objections to that verdict. Upon consideration of the Defendants' Motions, Plaintiff's Oppositions thereto, Defendants' Replies, and the entire record herein, the Court concludes that Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [# 113] must be **denied in part and granted in part** and Defendants' Motion to Alter or Amend Judgment and Apply the Damages Cap Under Title VII of the Civil Rights Act [# 115] must be **denied in part and granted in part**.

## I. *Background*

Plaintiff Elizabeth A. Martini was employed by Defendant Federal National Mortgage Association ("Fannie Mae") from July 1988 until March 8, 1995, when she received a termination notice. From January 1993 until April 1994, she was a Director of Long Term Funding and from April 1994 until her termination she served as a Director, Debt Sales.

Defendant Linda Knight, a Fannie Mae Senior Vice President in the Office of the Treasurer, supervised Plaintiff and Defendant Forrest Kobayashi, who was, initially, a co-worker of Plaintiff's in another . department within the Office of the Treasurer. However, during the time that Plaintiff worked at Fannie Mae, Defendant Kobayashi was promoted to the position of Vice President—Liability Management, and assumed supervisory responsibilities over Plaintiff. Plaintiff alleged that Defendant Kobayashi repeatedly harassed and demeaned her because she was a woman, creating a hostile work environment in violation of Title VII and the D.C. Human Rights Act. She also alleged that Defendant Knight, although told of Defendant Kobayashi's behavior, ignored Plaintiff's complaints. Finally, Plaintiff alleged that Defendants retaliated against her for complaining about Defendant Kobayashi's behavior by eliminating her position in an office reorganization which was planned and implemented by Defendants Knight and Kobayashi.

Plaintiff filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC determined that it would be unable to complete the investigation of Plaintiff's complaints within the 180 days mandated by statute. On or about May 1, 1995, the EEOC issued a right to sue letter to Plaintiff. Compl. ¶¶ 11–13.

On July 20, 1995, Plaintiff filed an action in this Court alleging harassment, retaliation, negligent infliction of emotional distress, intentional distress and negligent supervision.

Plaintiff brought her harassment and retaliation claims pursuant to Title VII. On May 3, 1996, the Court granted Plaintiff's motion for leave to amend her Complaint to bring claims for harassment and retaliation under the D.C. Human Rights Act. On July 10, 1996, the Court granted Defendants' Motion to Dismiss Plaintiff's Title VII claims as against Defendants Knight and Kobayashi because neither could be individually liable under Title VII. On August 19, 1996, the Court granted Defendants' Motion for Summary Judgment with respect to Plaintiff's common law tort claims. Defendants also moved to dismiss Plaintiff's D.C. Human Rights Act claims against Defendants Knight and Kobayashi on the grounds that those Defendants could not be held individually liable under the statute. On October 30, 1997, the Court denied Defendants' Motion.

Between November 18 and December 9, 1996, Plaintiff's remaining claims were tried before a jury. Defendants renewed their Motion to Dismiss the D.C. Human Rights Act claims with respect to the individual Defendants on November 19, 1996, which motion was denied by the Court on December 2, 1996. At the close of Plaintiff's case and again at the close of all the evidence, Defendants moved, pursuant to Fed.R.Civ.P. 50, for judgment as a matter law. The Court denied Defendants' motions. On December 12, 1996, the jury rendered a total verdict of $6,948,307.40 in favor of Plaintiff.[1]

With respect to Plaintiff's gender-based harassment claims against Fannie Mae under Title VII, the jury awarded Plaintiff $153,500 in back pay and benefits; $1,893,807.40 in future pay and benefits; $0 in emotional pain and suffering; and $1,000,000 in punitive damages. With respect to her retaliation claims against Fannie Mae under Title VII,

the jury awarded Plaintiff $0 in compensatory damages, but awarded $2,000,000 in punitive damages.[2]

With respect to her claims against Fannie Mae under the D.C. Human Rights Act, the jury awarded Plaintiff $0 in compensatory damages and $250,000 in punitive damages on her harassment claims and $500,000 for emotional pain and suffering and $1,000,000 in punitive damages on her retaliation claims. With respect to her claims against Defendant Kobayashi, the jury awarded Plaintiff $100,-000 [3] in damages for emotional pain and suffering and $20,000 in punitive damages on her harassment claims and $10,000 in damages for emotional pain and suffering and $10,000 in punitive damages on her retaliation claims. With respect to her claims against Defendant Knight, the jury awarded Plaintiff $0 in compensatory damages and $1,000 in punitive damages on her harassment claims and $5,000 in damages for emotional pain and suffering and $5,000 in punitive damages on her retaliation claims.[4]

Judgment on the verdict was entered on December 16, 1996. Defendants now raise several challenges to that jury verdict. Although the Court has carefully considered all of Defendant's contentions, this Opinion will address only those arguments that raise substantial issues for consideration. Defendants have already argued almost all of these issues at least once to either the jury or the Court and there is no reason to revisit them where an ample record from pretrial and trial proceedings already exists.

## II. *Application of the Title VII Damage Cap*

Congress has provided that a plaintiff's Title VII damage recovery is limited. The relevant provision provides:

---

1. This total verdict is the one actually rendered by the jury and does not include a $900,000 error entered on the verdict form. *See infra* note 3.

2. Plaintiff's total recovery against Fannie Mae under Title VII was $153,500 in back pay, $1,893,807.40 in compensatory damages for future pay and benefits, and $3,000,000 in punitive damages.

3. In open court on December 12, 1996, the jury stated that it's award was $100,000. The judg-

ment, however, was erroneously entered as $1,000,000. In their Motion to Alter or Amend Judgment, Defendants have moved to correct that error. That motion is **granted.** The judgment shall be corrected to reflect a judgment for $100,000 pursuant to Fed.R.Civ.P. 60(a).

4. Plaintiff's total recovery under the D.C. Human Rights Act was $615,000 in compensatory damages and $1,286,000 in punitive damages.

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party ... in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

42 U.S.C. § 1981a(b)(3)(D). Defendants ask that this damage cap be applied to the verdict rendered in favor of Plaintiff. The statute clearly requires that the Court reduce Plaintiff's Title VII recovery for compensatory and punitive damages for both her discrimination and retaliation claims from $4,893,807.40 to $300,000.[5]

■ Plaintiff makes a half-hearted argument that this damage cap may deny her equal protection of the laws under the Fifth Amendment's due process clause because the limitations it places on recovery for employment discrimination apply only to non-race-based claims. The Court is reluctant to address such an argument absent full briefing, but notes that before Congress added the damages provisions in the Civil Rights Act of 1991, Pub.L. No. 102–166, a Title VII plaintiff could recover back pay only. A Title VII plaintiff was unable to recover any compensatory damages for emotional pain and suffering or punitive damages, both of which were available to section 1981 plaintiffs for race-based claims. See H.R.Rep. No. 104–40(I) (1991), reprinted in 1991 U.S.C.C.A.N. 549. Now, Title VII permits a Plaintiff to recover up to $300,000. Thus, if any race-based differential in damages existed prior to the 1991 amendments, that differential has been virtually eliminated by those amendments which now allow recovery for both

compensatory and punitive damages (subject to the $300,000 cap).

■ Defendants contend that the $300,-000 cap should also be applied to limit Plaintiff's recovery under the D.C. Human Rights Act. They argue that, in enacting the cap, Congress intended that a prevailing Title VII plaintiff should be limited to a total of $300,-000. Further, they claim that allowing a plaintiff to assert claims under a state law, and thus avoid Title VII's damage cap, would undermine Congress' carefully crafted statutory and regulatory scheme.

The Court does not agree. Title VII has within it an explicit savings clause that provides:

Nothing in this title shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State [6] ...

42 U.S.C. § 2000e–7. This provision alone allows Plaintiff to recover under both Title VII and the D.C. Human Rights Act. Congress could have limited recovery under state human rights statutes if it wanted to, but chose instead to enact a savings clause to preserve existing state remedies. See Luciano v. Olsten Corp., 912 F.Supp. 663, 675 (E.D.N.Y.1996) (refusing to allocate jury award only to Title VII claims where the jury verdict did not identify the particular law under which damages were awarded), aff'd, 110 F.3d 210 (2d Cir.1997); Selgas v. American Airlines, Inc., 858 F.Supp. 316 (D.Puerto Rico 1994), aff'd in relevant part and rev'd in part, 69 F.3d 1205 (1st Cir. 1995). Further, although Congress decided to limit a plaintiff's recovery under Title VII, that limitation relates only to violations of federal, not state laws.[7] There is nothing inconsistent about allowing a state to provide its citizens more protection against discrimi-

---

5. Pursuant to 42 U.S.C. § 1981a(b)(2), back pay is not included in compensatory damages.

6. The term "State" includes the District of Columbia. 42 U.S.C. § 2000e(i).

7. Defendants' argument that Plaintiff's total recovery should be limited to that allowed under Title VII because she initially brought her claims under Title VII only is completely without merit.

This Court cannot second-guess a litigant's rationale for bringing particular claims at particular times. Further, given the administrative processes and strict time frames associated with many administrative schemes directed at redressing discrimination in employment, the Court is reluctant to penalize a litigant who may have been required to pursue administrative remedies in other fora before filing her present claims.

nation than that provided by federal laws.[8] *See Luciano,* 912 F.Supp. at 675–76.

Defendants also argue that recovery under the D.C. Human Rights Act should be limited to that available under Title VII because, generally, the District of Columbia courts look to Title VII for guidance in interpreting the D.C. Human Rights Act. *See Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n. 17 (D.C.1993). However, the courts have looked to Title VII case law for purposes of interpreting the substantive liability provisions of the D.C. Human Rights Act, not for purposes of crafting or limiting the remedies available to a plaintiff. The District of Columbia City Council did not choose to impose a cap on recoveries under the D.C. Human Rights Act and this Court will not infer one.[9]

■ Finally, Plaintiff "suggests" that the Court may reallocate the damages awarded under Title VII to Plaintiff's recovery under the D.C. Human Rights Act to fully effectuate the jury's intent. However, Plaintiff provides no legal support for such a reallocation. The jury made separate, specific awards under separate statutes, pursuant to specific instructions of law, and the Court will not disturb its findings to "reallocate" Plaintiff's damage awards.

For these reasons, Plaintiff's Title VII recovery for compensatory and punitive damages is limited to $300,000.

## III. *Jurisdiction*

■ Prior to trial, Defendants moved twice to dismiss Plaintiff's Complaint on the grounds that she failed to exhaust her administrative remedies. The Court denied both motions. Defendants now raise that contention yet again.

Specifically, Defendants contend that this Court was without jurisdiction to hear Plain-

tiff's Title VII claims because she failed to wait 180 days after filing her EEOC charge to bring suit in this Court. The Court has reviewed both of Defendants' prior motions, which they incorporated into their current motion, and Plaintiff's oppositions thereto, and still concludes that Defendants' arguments are without merit.

Plaintiff requested, and received, a right to sue letter before the expiration of the 180–day period specified in the statute. That notice was issued pursuant to an EEOC regulation, 29 C.F.R. § 1601.28(a)(2), authorizing the issuance of a right to sue letter before expiration of the 180–day period. Defendants rely on *Loney v. Carr–Lowrey Glass Co.,* 458 F.Supp. 1080, 1081 (D.Md.1978), to support the proposition that the EEOC regulation is inconsistent with Title VII's requirements, and that Plaintiff was still required to wait 180 days after filing her EEOC charge to file suit in this Court.

Our Court of Appeals has not addressed this issue. Among those courts which have addressed the issue, there is a split of authority. *See Grimes v. Pitney Bowes, Inc.,* 480 F.Supp. 1381, 1384–85 (N.D.Ga.1979) (collecting cases). Those courts which have found the regulation invalid have found that 42 U.S.C. § 2000e–5(f)(1) confers exclusive jurisdiction on the EEOC for a 180–day period which cannot be waived and have described the approval of an early right-to-sue letter as unwarranted judicial modification of Title VII. *See, e.g., People of New York v. Holiday Inns, Inc.,* 656 F.Supp. 675 (W.D.N.Y.1984); *Spencer v. Banco Real, S.A.,* 87 F.R.D. 739 (S.D.N.Y.1980); *Grimes, supra; Loney,* 458 F.Supp. 1080. However, other courts have allowed a plaintiff's suit to go forward, reasoning that the cause of action is not restricted by the administrative decisions of the EEOC or because the 180–day period had already run by the time the

---

8. This is especially true where, as here, Congress has not preempted the applicable state laws. Moreover, the Court notes that no legislative history has been cited to indicate that this was Congress' intention.

9. This is notwithstanding the statement in *Shepherd v. American Broad. Cos.,* 862 F.Supp. 486, 502 (D.D.C.1994), *vacated on other grounds,* 62 F.3d 1469 (D.C.Cir.1995), that Congress' upper

limit in Title VII cases "give[s] this court a sense of the national consensus on what a reasonable award is" for claims brought under the D.C. Human Rights Act. The plaintiff in that case had not brought any Title VII claims and, thus, such statement does not suggest that a plaintiff's total recovery under both Title VII and the D.C. Human Rights Act should be limited to $300,000.

court rendered its decision on the issue. *See Rolark v. University of Chicago Hosps.*, 688 F.Supp. 401, 404 (N.D.Ill.1988); *Featherstone v. Liberty Cash Grocers*, 82 F.R.D. 484 (W.D.Tenn.1979); *Eldredge v. Carpenters 46*, 440 F.Supp. 506 (N.D.Cal.1977).

Judge Moran's opinion in *Rolark* presents a persuasive rationale for allowing a Title VII suit to go forward even where the 180–day period has not yet elapsed. There, the court held that "the 180–day time period does not operate as an absolute bar." *Rolark*, 688 F.Supp. at 404. First, the court noted that a plaintiff's cause of action is generally not restricted by the EEOC's administrative decisions. *Id.* (citing *Jefferson v. Peerless Pumps Hydrodynamic*, 456 F.2d 1359 (9th Cir.1972); *Miller v. International Paper Co.*, 408 F.2d 283, 290 (5th Cir.1969)). Second, it noted that, although Congress had expressed a preference for administrative conciliation prior to litigation, nothing in Title VII expressly prohibits the EEOC from relinquishing its jurisdiction. *Id.*

This Court sees no reason to penalize a Plaintiff seeking to vindicate their rights under a civil rights statute, who has followed the dictates of the administrative scheme of the very agency charged with implementing that statute. Thus, the Court concludes that it did have jurisdiction over Plaintiff's claims.[10]

## IV. *Motion for New Trial and for Judgment as a Matter of Law*

 Defendants request that the Court grant them judgment as a matter of law or, in the alternative, a new trial. A new trial may be granted if the verdict is against the weight of the evidence, damages are excessive, the trial was not fair, or substantial errors occurred in the admission or rejection of evidence. *Luck v. Baltimore & Ohio R.R. Co.*, 510 F.2d 663, 668 (D.C.Cir.1975); *Lewis v. Elliott*, 628 F.Supp. 512, 517 (D.D.C.1986). A verdict cannot be set aside simply because the trial court deems it to be generous. *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C.Cir.1997). Judgment as a

matter of law is appropriate "only if the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men [sic] could not disagree on the verdict.'" *Hayman v. National Acad. of Sciences*, 23 F.3d 535, 537 (D.C.Cir.1994) (quoting *Carter v. Duncan–Huggins, Ltd.*, 727 F.2d 1225, 1227 (D.C.Cir. 1984)). Defendants argue that the evidence produced by Plaintiff and viewed in the light "most favorable to [her]", *Richardson v. Richardson–Merrell, Inc.*, 857 F.2d 823, 827 (D.C.Cir.1988), *cert. denied*, 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989) (citations omitted), is insufficient to support a finding of liability on her claims of gender-based harassment or retaliation.

Although the parties have filed lengthy pleadings on these issues, many of Defendants' arguments are simply repetitious versions of what was argued at great length—unsuccessfully—to the jury. As the Court stated when it denied Defendants' lengthy pretrial Motion for Summary Judgment, this is precisely the kind of case where the demeanor and credibility of witnesses, as well as the motivation and inferences to be drawn from a series of workplace events, must be—and was—evaluated by an impartial fact-finder. The jury clearly believed the Plaintiff and her evidence and rejected the evidence and interpretation of that evidence presented by the Defendants.

Further, although the verdict was obviously a substantial one, this case involved four claims under two statutes against three defendants, including one very large and profitable corporation against whom the jury assessed over $4 million in punitive damages. The jury carefully differentiated in its damage awards against the different Defendants. The size of the verdict does not, as Defendants argue, show that passion so influenced the jury that the verdict should be set aside in its entirety and a new trial ordered.

The Court will briefly address some of Defendants' remaining contentions.

**10.** Further, at the time that the Court decided Defendants' original motion, the 180–day period had already expired. That provides sufficient

ground for denying Defendants' motion as moot. *See, e.g., Rolark*, 688 F.Supp. at 404; *Grimes*, 480 F.Supp. at 1385; *Eldredge*, 440 F.Supp. at 515.

## A. Evidence of Gender–Based Harassment and Retaliation

In their Motion for Judgment as a Matter of Law or For New Trial, Defendants repeat, again, what are, in essence, closing arguments about what Plaintiff failed to prove at trial. First, they argue that Plaintiff provided no evidence of gender-based harassment and, even if she did, it was insufficient to prove that the conduct of which she complained was severe, pervasive, or egregious enough to constitute a hostile environment. Next, they argue that Plaintiff failed to provide sufficient evidence of retaliation. Defendants' arguments are simply unsupported by the record.

▮▮▮▮ With respect to Plaintiff's harassment claim, Plaintiff testified that she was subjected to abusive comments by Defendant Kobayashi on "almost a daily basis." However, Defendants argue that, since Plaintiff testified only about five specific instances, those must be the only instances of misconduct by Defendant Kobayashi. Plaintiff, in her Opposition, provides a detailed listing of the evidence that she introduced, including performance evaluations by Defendants Knight and Kobayashi, the contemporaneous notes of Defendant Knight, Plaintiff, and another witness, Ms. Doughty, and Ms. Doughty's corroborating testimony. It is clear that the jury believed Plaintiff's evidence and found the conduct to which she was subjected to be sufficiently pervasive to constitute a hostile environment.

The function of the Court when deciding a motion for a judgment as a matter of law is not to make credibility determinations, since such determinations are the sole province of the jury. *Hayman*, 23 F.3d at 535 (citing *Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983)). The Court's sole "task is to determine whether sufficient evidence was presented at trial to allow the jury reasonably to find for [Plaintiff]". *Grogan v. General Maint. Serv. Co.*, 763 F.2d 444, 447 (D.C.Cir. 1984). Here, the jury made credibility determinations in Plaintiff's favor, there was sufficient evidence in the record from which a reasonable fact-finder could reach those conclusions, and the Court has no basis for setting them aside.

▮▮▮▮ With respect to Plaintiff's retaliation claims, the evidence showed that Plaintiff complained to Defendant Knight about Defendant Kobayashi's behavior in 1993 and 1994. After Plaintiff first complained, Defendant Knight wrote her a note stating that she was "disappointed to learn that [Plaintiff was] going to file a complaint." Defendant Knight did not tell anyone else about Plaintiff's complaints and she did not, as required by Fannie Mae's policies, seek advice from the Office of Diversity. Nor did Defendant Knight ever discuss Plaintiff's complaint with Defendant Kobayashi. Despite Plaintiff's complaints, and without informing anyone in a higher position about the complaints, Defendant Knight recommended Defendant Kobayashi for promotion to Vice President.

Plaintiff then made informal complaints to the Office of Diversity in the summer of 1994. In November 1994, Defendant Knight and her supervisor, Mr. Howard, discussed reorganizing the Treasurer's office. Finally, Plaintiff filed a formal complaint with the Office of Diversity on December 30, 1994. When the reorganization, designed by Defendant Kobayashi and approved by Defendant Knight, took place, Plaintiff was the only person whose position was eliminated. It is not hard to understand why the jury reached its conclusion that Plaintiff's job was eliminated in retaliation for her complaints, when the very person against whom she was complaining, and his supervisor who had taken no action to address those complaints, designed the reorganization that eliminated her job.

Defendants argue that Plaintiff's complaint to the Office of Diversity was made after the decision to reorganize and, thus, there can be no causal nexus between her complaints and the elimination of her position. If Plaintiff's only protected activity had been filing a formal complaint with the Office of Diversity, Defendant's argument might have some merit. However, Plaintiff's informal complaints about Defendant Kobayashi were protected activity under Title VII and were made prior to any reorganization. Further, Defendants'

attempts to portray Plaintiff as unqualified, when her performance evaluations proved otherwise, were obviously not believed by the jury. It is clear that the evidence before the jury was not such that no reasonable fact finder could have found retaliation and, thus, the jury verdict must stand.

## B. The Damage Awards

■ Defendants challenge all the amounts awarded by the jury as excessive and not supported by the evidence. When examining the damages awarded by the jury, the court must consider: (1) "whether the verdict is beyond all reason, or ... is so great as to shock the conscience" or (2) "whether the verdict 'is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.'" *Webb v. Hyman,* 861 F.Supp. 1094, 1113 (D.D.C.1994) (quoting *Jeffries v. Potomac Dev. Corp.,* 822 F.2d 87, 96 (D.C.Cir.1987)). Again, given the evidence introduced at trial and the credibility determinations made by the jury, the overall finding of liability must stand, subject to the rulings in Section II, *supra.* The Court now turns to Defendants' challenges to specific damage elements.

### 1. Economic Damages

■ Title VII imposes an affirmative duty on a plaintiff to mitigate her monetary damages. *See Hopkins v. Price Waterhouse,* 920 F.2d 967, 981 (D.C.Cir.1990). The statute provides that "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g). The issue of a plaintiff's damages and whether she has sufficiently mitigated those damages is one for the jury. *See Carter v. District of Columbia,* 795 F.2d 116, 135 n. 13 (D.C.Cir.1986). The Court fully instructed the jury on Plaintiff's duty to mitigate her damages. A court must be hesitant to disturb a jury's determination of damages in cases, such as this one, which involve intangi-

ble and non-economic damages. *Ruiz v. Gonzalez Caraballo,* 929 F.2d 31, 34 (1st Cir.1991).

■ Defendants first argue that Plaintiff's failure to accept the position that Fannie Mae offered her in MBS–Investor Marketing was unreasonable.[11] That position was at the same level and salary as Plaintiff's previous position with Fannie Mae. Plaintiff admitted that it was a "good" position, that the person to whom she would have reported was a "good" supervisor, and that she could perform the duties of the job. However, despite the fact that Fannie Mae had thousands of employees in several different locations, the job offered Plaintiff was not only located in the same office building as the so-called "market room" where Defendants Kobayashi and Knight both worked, but was also in very close proximity to it.

Further, that job offer was made by letter dated August 23, 1995, one month after Plaintiff's Complaint was filed in this action. To accept, Plaintiff was required to notify Fannie Mae in writing by the close of business on August 30, 1995. The offer letter stated that if Plaintiff failed to act on it, Fannie Mae would "consider" her to have left voluntarily as of August 30, 1995. Under the circumstances, the jury could reasonably have concluded that Plaintiff, whose complaint to the Office of Diversity was resolved only one month before, was fully justified in failing to accept a job which would require her to work in such close proximity to the persons who she felt had harassed her and then reorganized her out of a job. Since the jury was instructed on both the general duty to mitigate and the relationship of mitigation to the offer of a substantially equivalent position, the Court assumes that it properly considered Plaintiff's failure to accept the MBS Investor—Marketing position when calculating the back pay to which she was entitled. *See Hopkins,* 920 F.2d at 982 (citations omitted).

■ Defendants also contend that Plaintiff did not use reasonable efforts to obtain

---

**11.** Defendants also contend that Plaintiff cannot recover front pay based on her failure to mitigate. Given the reduction of Plaintiff's jury award to comply with Title VII's damage cap, the Court need not address the precise breakdown of Plaintiff's damages within that cap.

employment outside Fannie Mae. They rely on cases which have held that a plaintiff who could have found work but made no efforts to do so may be denied back pay altogether. *See Hopkins,* 920 F.2d at 981–82 (citations omitted). However, those cases are inapposite because Plaintiff did seek other employment. What Defendants are really challenging is her degree of diligence in seeking employment to mitigate her damages.

The evidence showed that Ms. Knight terminated Plaintiff on March 8, 1995. At the time of her termination, Plaintiff held the position of Director, Debt Sales, a position with high level responsibilities at Fannie Mae. Her annual base salary was $71,000 and she had consistently been awarded valuable stock options. In April and May 1995, she applied for at least five other jobs comparable to her position at Fannie Mae. Given the challenging job and high level of responsibility that Plaintiff enjoyed at Fannie Mae, and the standing of Fannie Mae in the business community, the opportunities for finding an equivalent job were far from abundant. Indeed, Fannie Mae offered no evidence of other comparable jobs available in the Washington, D.C. metropolitan area.

When she was unable to find a comparable job in the Washington, D.C., area, Plaintiff decided in September 1995 to return to school and become a certified financial planner. This course of action would allow her, in approximately seven years, to earn what she would have earned at Fannie Mae.[12] Again, the jury was fully instructed on Plaintiff's duty to mitigate her damages and Defendants argued strenuously at trial that Plaintiff had not mitigated. Under these circumstances, the Court sees no reason to disturb the jury's verdict with respect to the back pay award.

## 2. Damages for Physical and Emotional Distress

▇ All of the damages awarded to Plaintiff for physical and emotional distress were awarded under the D.C. Human Rights Act. She was awarded $500,000 against Fannie Mae, $110,000 against Defendant Kobayashi, and $5,000 against Defendant Knight. The bulk of these awards was allocated to Plaintiff's retaliation claims. Defendants, as they did at trial, argue that Plaintiff presented no evidence of physical or emotional distress and that the damage awards cannot stand.

The evidence showed that Plaintiff suffered from stomach pains and was grinding her teeth. These symptoms first appeared around the time that Plaintiff was experiencing problems with Defendant Kobayashi. Defendants contend that Plaintiff did not prove a nexus between these symptoms and the situation at Fannie Mae. However, the jury heard all of the testimony and disagreed, even after Defendants argued these same points to it at great length.

Further, Defendants contend that Plaintiff did not suffer any emotional distress as a result of the employment discrimination she suffered at Fannie Mae. Their argument rests primarily on the testimony of their expert, who examined Plaintiff and testified that she did not suffer any psychological or physical injury and that she functioned at a very high level. However, the jury also heard Plaintiff's testimony about her strong feelings of humiliation and distress when she was terminated from a high-level position and escorted from her office by a security guard, as if she was a criminal. The jury also heard her testimony about the impact the termination had on her career and her apprehensions and fears about her professional future.

Plaintiff also testified about the effect her termination as a result of the reorganization had on her. She also introduced evidence from her treating physician and dentist about the physical manifestations of the stress she suffered as a result of Defendants' discriminatory actions. Consequently, Plaintiff successfully established that there was a causal relation between Defendants' actions and her physical and emotional suffering. *Accord, Nyman v. F.D.I.C.,* 967 F.Supp. 1562, 1571–72 (D.D.C.1997).

Finally, as the Supreme Court has made clear:

Fannie Mae, although Defendants' expert testified that it would take longer.

---

**12.** Plaintiff's expert testified that it would take seven years for Plaintiff to equal her salary at

**476**

Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993).

### 3. Punitive Damages

The jury awarded punitive damages to Plaintiff on all of her claims. Defendants raise two significant contentions with respect to the award of punitive damages: (1) punitive damages awarded in the absence of compensatory damages cannot stand; and (2) the evidence was insufficient to support such an award. The jury's award of punitive damages under Title VII has already been significantly reduced as a result of the application of the damage cap, *see supra* Part II. Thus, the Court will consider Defendants' arguments only as they relate to the jury awards under the D.C. Human Rights Act of $1,250,-000 against Fannie Mae, $30,000 against Defendant Kobayashi, and $6,000 against Defendant Knight.

■ With respect to Plaintiff's harassment claims under the D.C. Human Rights Act, the jury awarded Plaintiff $250,000 in punitive damages against Fannie Mae and $1,000 in punitive damages against Defendant Knight, but did not award any compensatory damages against either Defendant on those claims. Under District of Columbia law, "an award of punitive damages cannot stand alone, unaccompanied by compensatory

damages." *Bernstein v. Fernandez,* 649 A.2d 1064, 1073 (D.C.1991) (citing *Zanville v. Garza,* 561 A.2d 1000, 1001–1002 (D.C.1989) (*per curiam* )). *See also Jordan v. Medley,* 711 F.2d 211 (D.C.Cir.1983) (citation omitted); *Street v. Hedgepath,* 607 A.2d 1238, 1248 n. 9 (D.C.1992) (citations omitted).[13] Thus, those specific damage awards cannot stand and Plaintiff's recovery under the D.C. Human Rights Act must be reduced accordingly.

■ Punitive damages may be awarded where a defendant's conduct is " 'willful and outrageous ... or aggravated by evil motive, active malice, deliberate violence or oppression.' " *Nepera Chem., Inc. v. Sea-Land Servs., Inc.,* 794 F.2d 688, 698 (D.C.Cir. 1986) (quoting *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification Sys. Inc.,* 665 F.2d 1066, 1071 (D.C.Cir. 1981)). Thus, the touchstone inquiry is whether Defendants' conduct "contains elements of intentional wrongdoing or conscious disregard" of Plaintiff's rights. *Knippen v. Ford Motor Co.,* 546 F.2d 993, 1002 (D.C.Cir. 1976); *Nader v. Allegheny Airlines, Inc.,* 512 F.2d 527, 549–50 (D.C.Cir.1975), *rev'd on other grounds,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). Whether an award of punitive damages is warranted is a question for the jury. *See Kolstad v. American Dental Ass'n,* 108 F.3d 1431, 1439 (D.C.Cir.1997) (remanding for trial on punitive damages claim). Defendants now argue that Plaintiff's proof was insufficient to support a finding that Defendants' conduct rose to such a level.

■ The evidence presented at trial was more than sufficient to show "conscious disregard" of Plaintiff's rights. Plaintiff complained to her supervisor, Defendant Knight, that Defendant Kobayashi was subjecting her to sexual harassment. Defendant Knight dismissed Plaintiff's complaints, saying that Defendant Kobayashi's behavior was business-related. Defendant Knight did not con-

---

**13.** There is some support for the proposition that punitive damages can be awarded in the absence of compensatory damages. *See Day v. Avery,* 548 F.2d 1018, 1029–30 & n. 61 (D.C.Cir.1976), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d

394 (1977) (collecting cases). However, the majority of those cases have dealt with claims that were actionable at common law without specific proof of damage, such as trespass or slander *per se. Id.*

front Defendant Kobayashi promptly. Defendant Knight failed to report Plaintiff's complaints to the Office of Diversity and openly discouraged Plaintiff from filing a formal complaint. Despite the serious allegations about Defendant Kobayashi's conduct, he was recommended for and promoted to the position of Vice President.

After his promotion, Fannie Mae gave Defendant Kobayashi the significant responsibility for reorganizing the Treasurer's Office of Fannie Mae. Despite the assurances of Mr. Howard, the Treasurer, that there would be no downsizing because of the organization, Plaintiff's position was eliminated. Hers was the only position eliminated. Despite Defendant Knight's knowledge of the problems between Defendant Kobayashi and Plaintiff, she did not question his reorganization plan or the fact that the only person to lose her job was the one employee who had filed a discrimination complaint against the architect of the plan. Nor did she reveal the problems to her superiors or the Office of Diversity which was supposed to be consulted about discrimination matters.

Thus, the evidence at trial clearly supported a finding that Defendants consciously disregarded Plaintiff's rights by failing to take action to investigate or correct Defendant Kobayashi's behavior, failing to follow applicable procedures for processing Plaintiff's complaints, recommending Defendant Kobayashi for and promoting him to Vice President in the face of Plaintiff's complaints, and then allowing him to design a reorganization plan that eliminated only Plaintiff's job.

Defendant Fannie Mae cites *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), to show that the award of punitive damages assessed by the jury is unconstitutional. Defendants contend that their conduct lacked sufficient indicia of reprehensibility to sustain an award of this magnitude. The jury could reasonably conclude that a large corporation that had expended substantial resources to promulgate a code of conduct relating to sexual harassment, *see* Pl.'s Exs. 3–6, should have responded more promptly to Plaintiff's concerns. Moreover, because Fannie Mae is a huge corporation, with assets of over $300 billion and annual net profits of over $2 billion in 1994 and 1995, the jury could reasonably conclude, as Plaintiff urged, that only a significant award would effectuate the goals of punitive damages, i.e., to punish and deter reprehensible conduct.

### 4. Size of Damages

Defendants, primarily Fannie Mae, complain that the actual size of the amounts awarded are so excessively high as to shock the conscience and therefore must be set aside or substantially reduced. Although the legal standards for evaluating the size of a jury verdict are well established (see pp. 473–474 *supra*), there is no task more difficult for a trial judge than second-guessing the jury's award, many months later, in the cold and sterile light of post-trial briefs.

This jury was an attentive and conscientious one that listened to a trial that was relatively long (almost three weeks), and contentious. At times, witnesses on both sides gave emotional testimony justifying and explaining their actions. As with many discrimination cases, there were deeply-felt emotions held by the Plaintiff who felt she had been victimized and her promising career at Fannie Mae destroyed, and by the Defendants who felt they were falsely accused and were particularly proud of an institution they believed was devoted to the elimination of discrimination. All of this conflicting evidence was placed before the jury, and argued emotionally and lengthily by counsel in closing arguments. The jury did not rush to judgment and deliberated for more than 2 days before reaching its verdict.

These observations further strengthen this Court's view, which of course stems from the applicable case law, that the jury's verdict is to be viewed with great deference and respect, and not to be lightly tampered with.

The verdict must be analyzed in terms of various rulings already made in this Opinion as well as choices the jury made which are obvious from the structuring of its awards. Initially, the jury awarded a total of $5,047,-

370.40 against Defendant Fannie Mae under Title VII of the Civil Rights Act. That award has now been reduced, see Section II *supra,* to $453,500. In addition, the jury awarded a total of $1,901,000 against all three Defendants under the D.C. Human Rights Act. That award has now been reduced, see Section III 3, *supra,* to $1,650,000.

For the reasons already set forth, the Court concludes that there is ample evidence to support the jury's award under Title VII of $453,500 (comprising $153,500 in back pay and $300,000 in non-economic damages). Therefore, the Court will turn to the awards made under the D.C. Human Rights Act.

■ It is clear from examining the structure of the awards made by the jury under our local discrimination statute that it wished to impose very substantial punitive damages against the employer, Defendant Fannie Mae, as the ultimately responsible party, on both the harassment and retaliation claims. By refusing to award any damages against Defendant Fannie Mae for emotional pain and suffering on the harassment claim,[14] and by awarding a substantial amount ($100,000) for emotional pain and suffering and a significant, albeit lesser, amount in punitive damages against the individual who did the harassing, the jury was clearly demonstrating its recognition that Defendant Kobayashi had to be held personally accountable and punished for his gender-based harassment of Ms. Martini. The jury also made clear that by refusing to award any damages for emotional pain and suffering against Defendant Knight and by awarding a very nominal $1000 in punitive damages against her, that it did not find any great culpability on her part for the underlying gender-based harassment.[15]

On the retaliation claim, the jury's analysis appears to have been quite different. From its fairly modest awards for both pain and suffering and punitive damages against Defendants Kobayashi and Knight, it is clear that while the jury recognized some culpability on their part, it found the employer, Defendant Fannie Mae, to bear the primary responsibility for allowing Ms. Martini to be reorganized out of a job because of her harassment complaints.

Given the entire record presented in this case, the Court concludes that the allocation of responsibility and amount of awards made as to Defendant Kobayashi and Defendant Knight are eminently reasonably and supported by the evidence. In particular the jury's verdict reflects its conclusion that Mr. Kobayashi's gender-based harassment of Ms. Martini inflicted substantial pain and suffering and that the punitive damages assessed against him should be 20% of those non-economic damages. As to Defendant Knight, the jury viewed her as having no responsibility for the emotional damage caused by Defendant Kobayashi's gender-based harassment and therefore, as already discussed, she is not liable for the minimal punitive damages assessed against her. Finally, the Court concludes that it was entirely reasonable for the jury to hold Defendant Knight, as Defendant Kobayashi's direct supervisor, responsible, to a modest degree, for Plaintiff's emotional pain and suffering attributable to the retaliation.

■ Turning to the jury's award of $500,000 in emotional pain and suffering and $1,000,000 in punitive damages against Defendant Fannie Mae on the retaliation claim, the Court does conclude that those amounts are so "inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate", *Webb,* 861 F.Supp. at 1113. Given all the evidence in this case, ranging from Ms. Martini's initial humiliation and distress at being terminated to her ultimate ability to change her professional direction slightly and return to school in an allied field, the Court concludes that the award against Defendant Fannie Mae for emotional pain and suffering on the retaliation claim should be reduced to $100,000. In light of the jury's-initial determination that the punitive damages imposed against Defendant Fannie Mae on this claim should be double the amount of damages

---

14. The jury could not know, of course, that its decisions would preclude imposition of the substantial ($250,000) punitive damages it thought appropriate.

15. Here too, the jury did not know that the $1000 in punitive damages could not stand.

awarded for emotional pain and suffering, the Court will remit the punitive damages to $200,000.

Thus, the final damage awards in this case will be as follows:

| | |
|---|---|
| Title VII—Defendant Fannie Mae | $453,500 |
| D.C. Human Rights Act | $450,000 |

Defendant Fannie Mae—Retaliation claim—

| | |
|---|---|
| Emotional Pain & Suffering | $100,000 |
| Punitive Damages | $200,000 |

Defendant Kobayashi—Harassment claim—

| | |
|---|---|
| Emotional Pain & Suffering | $100,000 |
| Punitive Damages | $ 20,000 |

Defendant Kobayashi—Retaliation claim—

| | |
|---|---|
| Emotional Pain & Suffering | $ 10,000 |
| Punitive Damages | $ 10,000 |

Defendant Knight—Retaliation claim—

| | |
|---|---|
| Emotional Pain & Suffering | $ 5,000 |
| Punitive Damages | $ 5,000 |

## C. Errors of Law

Defendants contend that the Court made several significant errors of law which justify granting a new trial. The Court has given careful consideration to Defendants' arguments, as it did both before and at trial. Despite a careful review, the Court finds them to lack merit. However, the Court will briefly address three arguments raised by Defendants.

### 1. Individual Claims Under the D.C. Human Rights Act

■ Defendants argue, as they did in an earlier Motion to Dismiss, that Plaintiff could not assert claims against Defendant Knight or Defendant Kobayashi under the D.C. Human Rights Act. They assert that the D.C. Human Rights Act allows a plaintiff to sue her supervisors as agents of an employer but not in their individual capacities.[16] Although District of Columbia courts look to Title VII in interpreting the provisions of the D.C. Human Rights Act, see *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n. 17 (D.C. 1993), they have done so only where "appropriate." *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301 (D.C.1994).

The language of the D.C. Human Rights Act relating to discrimination in employment compels the conclusion that Title VII does not provide an "appropriate" analog for determining the scope of individual supervisor liability under the D.C. Human Rights Act.

Title VII prohibits acts of discrimination by an "employer". 42 U.S.C. § 2000e–2(a). The definitions section of the statute draws a clear distinction between a "person", including individuals, and an "employer", who is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(a), (b). The D.C. Human Rights Act, by contrast, defines particular types of acts as unlawful discriminatory practices and does not similarly limit the class of liable persons to employers. D.C.Code § 1–2512. Given the differences in statutory language between the federal and local statutes, the fact that the D.C. Human Rights Act is a remedial civil rights statute designed "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit" (D.C.Code § 1–2501), the plain language of the D.C. statute, and the need to effectuate its broad remedial purposes, the Court concludes that individual supervisors can be held liable for their acts of discrimination.

### 2. Office of Diversity Report

■ Defendants challenge the Court's failure to admit the Office of Diversity Report. Defendants claim that the report was a business record maintained by Fannie Mae in the normal course of business and that the conclusions of the report were admissible under Fed.R.Evid. 803(6). This argument, also made at trial, represented a dramatic switch in Defendants' position with respect to the Report.

In discovery, Defendants had successfully argued that the attorney-client privilege protected the Report from disclosure, over the

---

16. On July 10, 1996, the Court granted Defendants' Motion to Dismiss Plaintiff's Title VII claims against Defendants Knight and Kobayashi because neither could be held individually liable

under that statute. *See Gary v. Long,* 59 F.3d 1391, 1398 (D.C.Cir.992), *cert. denied sub nom, Gary v. Washington Metro. Area Transit Auth.,* —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995).

vigorous objections of Plaintiff, who tried, on many occasions, to obtain it. *See* Order of March 14, 1996 (denying Plaintiff's Motion to Compel). Defendants then used that ruling to argue *in limine,* again successfully, that Plaintiff should be precluded from introducing the Report into evidence. *See* Order of October 30, 1996 (granting Defendants' Motion in Limine).

At trial, Defendants switched their position. They argued that the Report, which was clearly hearsay, was admissible as a business record. Fed.R.Evid. 803(6) allows the introduction of a report if it is:

> made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of the business activity to make the ... report ... all as shown by testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness ...

Defendants simply could not meet the requirements for admissibility under the Rule. First, the person who prepared the report, Maria Johnson, was never listed or called as a witness and, thus, could not properly authenticate the Report. Second, Defendants' pretrial position, that the report was privileged and generated in preparation for litigation, is flatly inconsistent with a claim that the Report was kept in the general course of business. Finally, such a late introduction of the Report would obviously have been severely prejudicial to Plaintiff, who was not provided it prior to trial, who had no time to investigate the information underlying the Report, and who was not provided with over 2,000 pages of underlying supporting documents.

Thus, the Court properly excluded the Report.

### 3. Tax Returns

■ Defendants contend that the Court erred in failing to admit into evidence Plaintiff's tax returns, even though Plaintiff used them in testifying before the jury. They contend that those returns were relevant to the issue of damages and mitigation.

First, the Court is not convinced, given that Plaintiff testified and was cross-examined in some detail about her income and earnings, that Defendants suffered any prejudice from the refusal to admit the tax returns. Plaintiff's tax returns were filed jointly with her husband, who was not a party to the action, and, thus, contained information about Plaintiff's financial status that was completely unrelated to her earnings or her income potential.

Second, the Court may exclude relevant evidence if:

> its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. Whatever evidence was contained in the returns was not significantly probative of the issue of Plaintiff's duty to mitigate and was far outweighed by the privacy interests of Plaintiff's husband.

Thus, Defendants' Motion for a New Trial based on significant errors of law is denied.

### V. *Conclusion*

For the reasons discussed above, Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [# 113] is **denied in part and granted in part** and Defendants' Motion to Alter or Amend Judgment and Apply the Damages Cap Under Title VII of the Civil Rights Act [# 115] **is denied in part and granted in part.** Specifically, Plaintiff shall recover as follows:

With respect to her Title VII discrimination and retaliation claims against Fannie Mae, Plaintiff is entitled to $153,500 in back pay and benefits and $300,000 in compensatory and punitive damages, for a total Title VII recovery of $453,500.

With respect to her D.C. Human Rights Act claims against Fannie Mae, Plaintiff is entitled to no damages on her gender-based harassment claim. With respect to her retaliation claim she is entitled to $100,000 in

damages for emotional pain and suffering and $200,000 in punitive damages for a total of $300,000.

With respect to her D.C. Human Rights Act claims against Defendant Kobayashi, Plaintiff is entitled to $100,000 in damages for emotional pain and suffering and $20,000 in punitive damages on her gender-based harassment claim, and $10,000 in damages for emotional pain and suffering and $10,000 in punitive damages on her retaliation claim, for a total of $140,000.

With respect to her D.C. Human Rights Act claims against Defendant Knight, Plaintiff is entitled to no damages on her gender-based harassment claim, but is entitled to $5,000 in damages for emotional pain and suffering and $5,000 in punitive damages on her retaliation claim, for a total of $10,000.

Thus, Plaintiff's total recovery on all claims is $903,500.

An Order shall issue with this Opinion.

### ORDER

This matter is before the Court upon Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [# 113] and Defendants' Motion to Alter or Amend Judgment and Apply the Damages Cap Under Title VII of the Civil Rights Act [# 115]. Between November 18 and December 9, 1996, Plaintiff's gender-based discrimination and retaliation claims under Title VII of the Civil Rights Act, *as amended*, 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act, D.C.Code § 1–2501 *et seq.*, were tried before a jury. On December 12, 1996, the jury rendered a verdict for Plaintiff on her claims. Defendants' Motions raise numerous objections to that verdict. Upon consideration of the Defendants' Motions, Plaintiff's Oppositions thereto, Defendants' Replies, and the entire record herein, for the reasons in the accompanying Memorandum Opinion, it is this 10th day of September, 1997, hereby:

**ORDERED,** that Defendants' Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial or Remittitur [# 113] is **denied in part and granted in part** and Defendants' Motion to Alter or Amend Judgment and Apply the Damages Cap Under Title VII of the Civil Rights Act [# 115] **is denied in part and granted in part;** and it is further

**ORDERED,** that the Judgment on the Verdict for the Plaintiff, entered by the Court on December 13, 1996, be amended to reflect that the jury awarded Plaintiff $100,000 in damages for emotional pain and suffering with respect to her gender-based harassment claim against Mr. Kobayashi under the D.C. Human Rights Act; and it is further

**ORDERED,** that the Judgment on the Verdict for the Plaintiff entered by the Court on December 13, 1996, be amended and reduced. That Judgment shall now read as follows:

Damages for back pay and benefits under Title VII against Defendant Fannie Mae: $153,500.

Future pay and benefits, emotional pain and suffering, and punitive damages under Title VII against Defendant Fannie Mae: $300,000.

Punitive damages for gender-based harassment under the D.C. Human Rights Act against Fannie Mae: $0.

Damages for emotional pain and suffering for retaliation under the D.C. Human Rights Act against Fannie Mae: $100,000.

Punitive damages for retaliation under the D.C. Human Rights Act against Fannie Mae: $200,000.

Damages for emotional pain and suffering for gender-based harassment under the D.C. Human Rights Act against Defendant Kobayashi: $100,000.

Punitive damages for gender-based harassment under the D.C. Human Rights Act against Defendant Kobayashi: $20,000.

Damages for emotional pain and suffering for retaliation under the D.C. Human Rights Act against Defendant Kobayashi: $10,000.

Punitive damages for retaliation under the D.C. Human Rights Act against Defendant Kobayashi: $10,000.

Punitive damages for gender-based harassment under the D.C. Human Rights Act against Linda Knight: $0.

Damages for emotional pain and suffering for retaliation under the D.C. Human Rights Act against Defendant Knight: $5,000.

Punitive damages for retaliation under the D.C. Human Rights Act against Defendant Knight: $5,000.